GALVESTON, HARRISBURG & SAN ANTONIO RAILWAY COMPANY
v. THE STATE OF TEXAS.

No. 7870.

1. **Pleading—Supplemental Petition.**—A plaintiff by supplemental petition set up matter which should have been pleaded by amendment. Such irregularity, not excepted to, will not be revised on appeal.

2. **Forfeiture of Charter of Corporation.**—It is a general rule that the forfeiture of the franchises of a corporation can not be claimed in a collateral proceeding merely because a ground of forfeiture may exist. The forfeiture must be declared in a judicial proceeding instituted for that purpose.

3. **Same—Collateral Proceedings.**—When the rights of a corporation come into inquiry in a collateral proceeding the case is to be treated as if no ground of forfeiture existed, unless there has been a judgment so declaring in a direct action by the State.

4. **Same—Express Forfeiture by Statute.**—When apt words are used to express that the forfeiture shall take place upon the happening of a contingency without the necessity of a judicial declaration, then the courts will give effect to that intention whenever the question is presented in a judicial inquiry. Bywaters v. Railway, 73 Texas, 627.

5. **Construction of Charter.**—The language used in the charter construed is that upon the failure of the company to construct its road to San Antonio within the prescribed time "then this charter shall be forfeited." This language neither prescribes nor indicates the manner of forfeiture. In cases where such words are employed the uniform construction is that they prescribe a ground of forfeiture, and that the manner must be by a judicial proceeding instituted for that purpose.

6. **Forfeit, Forfeited.** — In such connection and alone the term *forfeit* has been imbued with a technical signification, and is the word universally used in charters for prescribing the grounds upon which a judicial forfeiture may be claimed. Rev. Stats., arts. 4278, 4280.

7. **When Statute Takes Effect.** — We apprehend that no universal rule of construction can be adopted when a statute which makes a distinction between future and past transactions is passed upon one day to take effect upon another; but we think the general rule is that the statute speaks from the time it becomes a law, and that what has occurred between the date of its passage and the time it took effect is deemed with respect to the statute a past transaction, unless where a different rule is expressed.

8. **Construction of Statutes—Land Grant—Act of August 16, 1876.**—The proviso in said act should be construed as if it read, "this act shall not be construed to renew any right to companies that have heretofore failed, or to continue any right to companies that may hereafter fail, to comply with the terms of their charters," etc. The appellant company had never acquired any right to earn lands by the construction of its road between the Guadalupe River and the city of San Antonio before the passage of the Act of August 16, 1876; and having already failed to construct to San Antonio within the time required by its contract and the general laws of the State, it follows that the privilege was neither a renewal of a lost or forfeited right nor the continuance of one existing when the act took effect. The appellant was not therefore excluded by the letter of the statute from the benefit conferred by it. * * * We also strongly incline to the opinion that railway companies who had failed to comply with the law with regard to the construction of their roads within specified times, and who had not been entitled to participate in the State's bounty, were not intended to be excluded from the benefit of the statute of August 16, 1876. The question being doubtful, the action of the executive department is followed in holding that the appellant was not excluded from the land grant in said act.

9. **Sidings—Turnouts—Switches.** —Sidings, turnouts, and switches are necessary parts of a well equipped railway, and are parts of such road.

10. **Sidings, etc., Not to be Counted Under Act of August 16, 1876.**— The language of the statute (Act of August 16, 1876) touching grant of land to railway companies is, "That any railway company heretofore chartered, or which may be hereafter organized under the general laws of the State, shall, upon the completion of a section of ten miles or more of its road, be entitled to receive and there is hereby granted to every such railway from the State sixteen sections of land for every mile of its road so completed and put in good running order." The grant is intended to inure upon the construction of ten miles of lineal extension of the road, and not upon the construction of such number of miles of tracks made up together with the main line and sidetracks used in connection with it. The right to lands only extends to the miles of extension of completed road upon its line, and not to sidetracks.

11. **Sidings, etc., Under Act of 1854.**—The twelfth section of the Act of 1854 provides: "The provisions of this act shall not extend * * * to any company for more than a single track road with the necessary turnouts." This is not in the Act of August 16, 1876. It admits of the construction to include sidetracks in its earnings of land. The construction of the executive department under the act of 1854

could not properly apply to that of 1876 with reference to the right of railway companies for land for sidings, etc.

12.  Construction by Executive Where Law is Clear.—While in cases of doubtful construction of a statute that adopted by the executive is entitled to much weight, yet where the meaning is clear the statute is the guide for the judiciary.  An executive construction contrary to its clear intent will not be followed.

13.  Certificates Void Only for the Excess of Miles of Road.—The issue of certificates for the lineal miles of the road and for sidetracks together is not void save for the excess granted for the sidetracks.

14.  Mode of Adjustment.—In absence of fraud, as in this case, the railway company should have the right to select the locations it desires out of the locations made, the excess to revert to the State.  Consideration, perhaps, should be taken of rights of purchasers, etc.

APPEAL from Val Verde.  Tried below before Hon. Winchester Kelso.  The opinion states the case.

*E. P. Hill*, for appellant.—1. The question in the case is as to the right to land for sidings and switches under the law granting lands to railways.  The district judge. held in favor of the State on the question, and from his opinion this appeal is taken.

The court erred in its conclusions of law in holding that the laws granting lands to railways did not grant lands for sidings and switches, but for main track only.

The Act of January 30, 1854 (Pasch. Dig., art. 4945), provided that "Any railway company chartered by the Legislature of this State, heretofore or hereafter constructing within the limits of Texas a section of twenty-five miles or more of railway shall be entitled to receive from the State a grant of sixteen sections of land for every mile of road so constructed and put in running order;" and under the law, from the beginning down, the sidetrack of railways was included as miles of road constructed, and lands were received for it the same as for main track.

During the administration of Governor Pease, and on down through all administrations, engineers appointed by the Governors for that purpose examined and measured the roads as constructed from time to time, made their reports of miles of main and sidetrack, which reports were examined and approved by the Governors; and the Commissioners of the General Land Office issued certificates and patents for land both side and main track, and in two instances reports were made and approved for sidetrack alone.

The Constitution of 1869 prohibited grants of land to railways, and when by amendment that prohibition was removed the Legislature passed the Act of August, 1876 (Rev. Stats., art. 4267), and in returning to the policy of granting land to railways the same identical language in effect was used as was employed in the Act of 1854.

For twenty-two years (from 1854 to 1876) the uniform construction of the law had been that railways were entitled to land for sidetrack as well as main track, and through the official acts of the executive officers of the State government they received land for the one as well as for the other.

The Legislature that passed the Act of 1876 and the Governor who approved it knew what the uniform construction of the Act of 1854 had been, and that the railways had all the time received land for sidetrack under that act; and in adopting into the new act the language of the old they adopted and approved the construction and meaning of the old act as settled by the long and unvarying practical administration of it. If there had existed any dissent from the universal construction that had been given to the Act of 1854, the same expression would not have been employed in the Act of 1876.

Following the Act of 1876, the same construction of it and the same administration of it was adopted and continued that had always prevailed under the Act of 1854, with the single exception that Governor Roberts approved the reports of engineers for the number of miles of main track only, and this—the only dissent ever manifested—was after appellant had received the lands in question in this suit. Hahn v. United States, 107 U. S., 405; Brown v. United States, 113 U. S., 571; Westbrook v. Miller, 56 Mich., 148; Railway v. Railway, 53 Pa. St., 20; Sedg. Stat. and Con. Law, p. 227; Railway v. The State, 77 Texas, 367.

As a rule, the cases on the point involve no undoing of the past, but merely the question of further continuance of a precedent, the reversal of which would have caused no special detriment or disturbance; while in the present case, to overturn the construction of the law and undo all that has been done for nearly forty years under it would be disastrous to large interests—individual as well as corporate—overturning a construction which it may be accurately said has become a rule of property and involves the good faith of the State.

When the policy of inducing construction of railways by holding out the promise of lands was inaugurated by the people of Texas, there were millions of acres of land—a vast wilderness—and not a foot of railway. Naturally, under such conditions, the disposition was to liberality of construction. Now circumstances have changed, and we are changed with them.

2. The court erred in adjudging the land certificates to be null and void and that they be canceled and held for naught.

The statement of facts and finding of the court show that the 619 certificates were issued for main and sidetrack. There is an error therein, in that they state the mileage as $36\frac{14744}{5280}$ main track and $2\frac{3000}{5280}$ sidetrack, which is correct as to the mileage, only it should have been $30\frac{1805}{5280}$ miles main track and the remainder sidetrack, the error having been made in the Land Office.

Sixty of the 619 certificates were located in Val Verde County on the land sued for. If it were admitted that the railway company was not entitled to land for sidetrack, it is clear that the suit as brought can not be sustained and that the judgment holding the certificates null and void and canceling them is erroneous. After the certificates have been located and right to land acquired under them, the plain and only remedy (if there was any basis for such a suit at all) would be a suit to recover of the lands acquired under the certificates that proportion of them received for sidetrack and have partition.

It is a travesty on justice and common sense to say that the railway should be deprived of the land received for the thirty and odd miles of main track, under any view of the law, when by the simple remedy suggested the rights of both parties could be respected and preserved.

*Charles A. Culberson*, Attorney-General, for the State. — There are only two assignments presented by the brief of appellant which will be considered here, in the order presented, to which will be added an additional proposition by the State.

1. The sixth assignment is that "the court erred in its conclusions of law in holding that the laws granting lands to railways did not grant lands for sidings and switches, but for main track only."

The certificates recite and appellant contends that they were issued by authority of the Act of January 30, 1854, and the acts amendatory thereof, but it is clear that those acts would not authorize the issue. No portion of the road for which the certificates were issued was constructed prior to 1869, it being admitted that the whole of it was constructed subsequent to October 31, 1876, and the land was not earned until the road was completed. The repeal of the law destroyed the right. Chalk v. Darden, 47 Texas, 438; Salt Co. v. Saginaw, 13 Wall., 373.

The Act of 1854 and amendments thereto were unquestionably repealed by the Constitution of 1869 (art. 10, sec. 6), which provides that "the Legislature shall not hereafter grant lands to any person or persons, nor shall any certificate for land be sold at the Land Office, except to actual settlers upon the same, and in lots not exceeding 160 acres." That this law was repealed is recognized by the fourth section of the Act of 1876. Bacon v. Russell, 57 Texas, 409; Holmes v. Anderson, 59 Texas, 481; White v. Martin, 66 Texas, 340.

This section of the Constitution was amended on March 19, 1873, under which the Legislature was authorized to grant lands for purposes of internal improvement not exceeding twenty sections per mile of completed work (Pasch. Dig., art. 1138); but the adoption of this amendment did not revive the repealed statutes. Const. 1869, art. 12, sec. 18; Const. 1876, art. 3, sec. 36; Suth. Stat. Con., sec. 168; Renter v. Bauer, 3 Kans., 505.

No law expressly granting lands was enacted under this amendment, and it was superseded by article 14, section 3, of the present Constitution, by which it is provided that there shall never be granted to any railway company more than sixteen sections to the mile, and no land certificate shall be issued to such company until it has "equipped, constructed, and in running order" at least ten miles of road. Under this provision the Act approved August 16, 1876, was passed. It was incorporated in the Revised Statutes as article 4267, and was subsequently repealed by the Act of 1882.

As heretofore stated, it is not believed that appellant is entitled to any land whatever under the Act of 1854 and amendments, yet as its claim is based in argument upon those acts, as well as the acts of 1876, they will be considered. By section 1 of the Act of 1854 it is enacted that any domestic railway company "constructing within the limits of Texas a section of twenty-five miles or more of railway shall be entitled to receive from the State a grant of sixteen sections of land for every mile of road so constructed and put in running order." Section 6 provides "that any railway company having completed and put in running order a section of twenty-five miles of its road" may give notice to the Governor and have it examined, preparatory to the issuance of certificates.

These provisions were not modified by any of the amendatory acts. Section 1 of the Act of 1876 provides that any railway company "shall, upon the completion of a section of ten miles or more of its road, be entitled to receive, and there is hereby granted to every such railway, from the State, sixteen sections of land for every mile of its road so completed and put in good running order;" and by section 2 it is declared that it "shall appear that said road is substantially built and fully equipped for the transportation of both passengers and freight." It will be observed that by each of these acts the road must be completed in sections of ten and twenty-five miles respectively, although the quantity of the land earned is determined by the mileage. Such being the law, appellant insists that in ascertaining the quantity of land to which it is entitled upon the completion of a section of road, it is proper to take the total mileage of the main single track and the sidings, switches, and turnouts. In support of this theory the only argument advanced is that it was accepted and acted upon by Governors Davis, Coke, and Hubbard. It is, however, admitted that Governor Roberts rejected claims for sidings, and it is not shown what course was pursued by other Governors than the four named, since 1854. If the construction put upon the law by the executive department uniformly accorded with that relied upon by appellant, it could not be invoked here, unless the statute is of "doubtful import and can not be made plain by the help of any other part of the same statute;" and where the "decisions are conflicting it can not be said there is a contemporaneous exposition, and the court must look to the words of the statute and in-

terpret them by its own unfettered judgment.'' Suth. Stat. Con., sec. 307; Railway v. The State, 77 Texas, 388.

The State contends that while the executive interpretation is not uniform, but conflicting, the law is plain that lands were donated for the length of the main track only. The Constitution declares that no land certificate shall issue to a railway company until it has "equipped, constructed, and in running order at least ten miles of road." The Act of 1854 requires the road to be "constructed and put in running order," and to be "completed and put in running order." The law of 1876 is even more exacting, requiring the road to be "completed and put in good running order," and to be "fully equipped for the transportation of both passengers and freight." It has also been shown that to be entitled to the grant the road must be completed in sections. Common sense and general knowledge teach us that sidings, switches, and turnouts are necessary parts of a railway. They are absolutely essential to its operation, and of this the courts take judicial knowledge. Railway v. Wilson, 17 Ill., 123; Dow v. Railway, 18 Ill., 324.

Instances are numerous in which the courts have declared that sidings are necessary appendages to a complete and well equipped railway, and the contrary has never been held. This is particularly noticeable where the railway companies have invoked the extraordinary power of eminent domain, though the decisions are not confined to that subject. 1 Wood's Ry. Law, pp. 479, 648, 653, 654; 1 Mora. on Corp., sec. 369.

In Railway v. Williams, 54 Pennsylvania State, 107, construing the clause which authorizes the company to locate and construct a railway of one or more tracks, it is said: "This grant of power unquestionably carries with it the right to construct turnouts, sidings, stations, and engine houses, and all the works and appendages usual in the convenient operation of a railway. A railway without switches, sidings, turnouts, and buildings for fuel, water, engines, stations, etc., would be useless in a great measure. They are essential to the operation of the road and to transportation of freight and passengers with security and dispatch."

In Railway Company v. Speer, 56 Pennsylvania State, 335, it is held: "The power of the company to run its road to Pittsburg and to locate and construct it on Preble Street being established, it carries with it the authority to make and maintain switches, which are the direct subject of this action. By the expressed words of its charter the power is conferred of making as many sets of tracks as are deemed necessary, but if this were not expressed, it is clearly to be inferred from the general powers conferred and the essential purposes of the grant. The power to build sidetracks is essential to the purposes and use of the road. The power to build a railway of a single track without the means of passing the trains, or of leaving the track for the shifting of cars or for repairs at the shops and yards, without standing room for

the cars not in motion, would be clearly wanting in all that is necessary to safety, convenience, and utility, and would be vain and nugatory."

In Black v. Railway, 58 Pennsylvania State, 252, it is said: "The word railway ex vi termini includes sidings, and must of necessity include the present track or branch which is complained of by the plaintiff."

In Pfaff v. Railway, 108 Indiana, 148, it is decided: "A railway can not be operated with anything like success with a single track. It is necessary to have a double track or turnouts and sidetracks in order that trains going in opposite directions may pass. It is just as necessary that there should be turnouts and sidetracks for the making up of trains, the changing of engines, the replenishing of them with water and fuel, and the loading and unloading of freight. With many of the more important lines it is found necessary to have many such turnouts and sidetracks in order that the business may be done with dispatch in obedience to the demands of commerce and traffic. These sidetracks, such as are required at commercial centers and the larger cities and towns, can not be crowded upon a narrow strip of land such as may be sufficient betweeen stations."

When, therefore, it is provided that railway companies shall receive sixteen sections of land "for every mile of road so completed and put in good running order," and which shall be "fully equipped for the transportation of both passengers and freight," it is manifest that the main track only should be computed, for the sidings are necessary to the completion and operation of the main line. They are in truth component parts of the main line, essential to its perfection, and without which there would be no railway either as a practical fact or within the meaning of the statute. But if more convincing argument were necessary to show that sidings and turnouts are part of the main line and not to be included in the computation, it is furnished by the clear and unequivocal language of the twelfth section of the Act of 1854, in which, to remove all doubt, it is declared "that the provisions of this act shall not extend to any company receiving from the State a grant of more than sixteen sections of land, nor to any company for more than a single track road with the necessary turnouts." By the same section branch roads also are excluded from all benefits under the act.

2. The fourth assignment is that "the court erred in adjudging the land certificates to be null and void, and that they should be canceled and held for naught."

Though it is not clearly stated, the contention of appellant on this point seems to be, that as the company is entitled to land for thirty miles and 1205 feet of main track, even under the theory of the State, if it is entitled to any, the entire issue of the sixty certificates which were located in Val Verde County, into each of which as is shown by its face both main track and sidings entered, is not void but at most is only .

voidable for the excess. If this can be considered an ordinary case of excessive grant, it is believed the whole issue of certificates is nevertheless absolutely null and void. By the acts complained of there were granted to the company 619 certificates of 640 acres each, for thirty-eight miles and 3474 feet of railway, aggregating 396,160 acres of land. This was clearly excessive to the extent of eight miles and 2269 feet of road, or 86,320 acres of land. Such an excess, amounting to nearly 22 per cent of the entire grant, can not be treated as trivial or accidental. The excess can be so great as to induce the belief that a fraud has been practiced, and in this case it is so great that it bears upon its face evidence of positive and legal fraud. Elliot v. Mitchell, 28 Texas, 111.

In Polk v. Wendall, 9 Cranch, 87 (2 Curtis, 278), it was said by Chief Justice Marshall that if a patent was issued for a greater quantity of land than was authorized by law it was conclusive of the right of the State to cancel the patent. This right of the State to cancel patents or certificates is not limited to cases of fraud, but exists where they have been issued through ignorance or mistake. Certainly in this case, not to characterize it more harshly, these conditions exist. United States v. Stone, 2 Wall., 525; United States v. Atherton, 102 U. S., 372.

But for several reasons the case can not be regarded as within the rule of excessive grants. In the first place it is plain that it is not simply a mistake of figures. It does not appear that the basis upon which the grant proceeded is correct, and that errors of calculation or description produced the discrepancy; nor is there any pretense that it was accidental. On the contrary, it is evident that the theory upon which the transaction was consummated is unsound in principle and in violation of law. Matters in themselves possibly furnishing in part a valid consideration for the donation are indistinguishably mingled in each certificate with others of an illegal character, and neither by extrinsic evidence nor from the certificates themselves, constituting distinct and independent evidences of a right, is it possible to separate the lawful in each from that which is unlawful.

In another view the doctrine contended for is inapplicable. It is true that, admitting appellant's right to land for the main track, and taking the whole issue of 619 certificates, the precise excess in acres can be ascertained. Yet that would not furnish a satisfactory solution of the difficulty or give the State a practical and adequate remedy. Each certificate is a separate and distinct evidence of a right to land, assignable and transferable, and each has been located. The record discloses that appellant, the original grantee, still claims to be the owner of the sixty certificates in controversy, and the land upon which they are located. But it is not shown who owns or claims the remainder. Under the law it must be presumed that one-half of the whole has been alienated, for otherwise it is forfeited to the State; and it is not unreason-

able to suppose that in many instances one person will be found to claim only one certificate or section of land. If the State is held to the remedy of reforming the grant to the extent of the excess, it must also seek partition. This, however, would be futile and impracticable unless one person or corporation should own the entire grant, for the excess in each certificate or section or any number less than the whole can not be ascertained by evidence. If in reply to this it be said that some of the certificates were issued exclusively for main track and some exclusively for sidings, then if such be the case it is evident, as shown by the fourth conclusion of fact found by the learned district judge, that the certificates do not show and it is impossible to discover by evidence aliunde which certificates were so exclusively issued for main track and sidings respectively, and consequently the entire issue is void. All the certificates were issued and delivered together. Hedges v. Dixon, 37·Fed. Rep., 304; Daviess County v. Dickinson, 117 U. S., 662.

Finally, the remedy of reformation and partition would not only produce confusion in the administration of the public lands, but would be unjust to the State in the case under consideration, because in that event the 86,320 acres recovered would necessarily be scattered over the State in isolated and fragmentary bodies, and would be rendered practically valueless and difficult of disposition.

The burden was upon appellant to show that partition was practicable and not unjust under any probable condition and ownership of the land; and failing to do so, it can not now insist upon that remedy. Should the court not concur in the views presented under this assignment, the judgment, it is submitted, should be affirmed notwithstanding, for this reason: It clearly appears from the most favorable view which can be taken of the case for appellant that it wrongfully obtained certificates and has located them upon 86,320 acres of land to which it is not entitled. The recovery in this case is only for 38,400 acres, less than one-half of what the State has been deprived.

3. The State presents the additional proposition that if in the opinion of this court the judgment can not be supported upon the grounds put by the district judge, which have been discussed, yet it was nevertheless correctly rendered, because appellant having failed to complete its road to San Antonio within the time prescribed by its charter it was ipso facto dissolved and its charter forfeited.

It is no objection to a judgment that an erroneous reason was given for its rendition. Green v. Cross, 15 S. W. Rep., 220.

Section 3 of the Act of July 27, 1870, under which appellant was organized, provides: "That said new company is hereby authorized to extend the existing line of railway owned and operated by said company from Columbus, in Colorado County, to San Antonio, in the county of Bexar, within four years from the passage of this act, and thence to the terminus on the Rio Grande by such route as the directors shall

deem most feasible, with a branch from the most suitable point to New Braunfels, in Comal County, within four years from the passage of this act; or said new company may connect with any line of railway that may be constructed or under construction to San Antonio or the Rio Grande south of the latitude of the city of Austin and the Colorado River, instead of building its own line beyond the point of such connection; and may build it and connect with any line of railway that may be constructed or under construction and designed to form a part of any railway line to the Pacific south of the thirty-fifth parallel of latitude; nothing herein being so construed as to exclude said new company from the right to construct, also, any part of the line up the Colorado Valley, formerly designated by said 'sold-out' company as its route under the provisions of the eleventh section of the Act of December 19, 1857; provided, that if the said road shall not be completed within the time specified in this section, then this charter shall be forfeited."

On the trial it was agreed "that the road of defendant from the Guadalupe Bridge to San Antonio for which the certificates described in the petition were issued was constructed and completed between November 17, 1876, and February 13, 1877, and that the two miles and 2000 feet of sidings east of Guadalupe Bridge was constructed and comcompleted subsequent to October 31, 1876, and prior to February 13, 1877."

It will thus be seen that though appellant undertook under pain of forfeiture of its franchise to complete its road to San Antonio within four years from July 27, 1870, it did not complete the road until February 13, 1877. Such being the admitted facts, that the law is self-executing and the charter of appellant forfeited is not an open question in this court. Article 4278, Revised Statutes, prescribes that if any railway company "shall not, within two years after its articles of association shall be filed and recorded as provided in the second section of this act, begin the construction of the road, and construct, equip, and put in good running order at least ten miles of its proposed road, * * * such corporation shall * * * forfeit its corporate existence," etc.

Construing this clause this court said: "We think there can be no doubt that the statute is self-acting, and that appellee having failed to begin the construction of its road with the two years forfeited its corporate power to do any act not looking to the winding up of its business. * * * The State had the right to prescribe the terms upon which appellee acquired its charter, and to attach to its grant of corporate power the conditions and limitations upon which its creature, the corporation, should continue to exist and exercise its corporate powers." Bywaters v. Railway, 73 Texas, 627; 2 Mora. on Corp., sec. 1006, and authorities.

It may be said, however, that the Act of March 10, 1875 (Special Laws 1875, p. 81), extended the time for the completion of the road to San Antonio to January 28, 1876. But this does not relieve the forfeiture. That act was passed six months after the corporation was dissolved, and under the decision from our State last cited it was incompetent for the Legislature to revive it; and if the validity of the act for the purposes of extension be conceded, the franchise was nevertheless annulled because the road was not completed within the time even there prescribed. It follows, therefore, that as the charter was forfeited the company could not acquire the land. Saltmarsh v. Bank, 17 Ala., 766; 3 Wood Ry. Law, p. 1715, sec. 500.

By THE COURT (June 16, 1891).—The submission in this case is set aside, and counsel are requested to file additional briefs or arguments upon the following questions:

1. Did not the appellant company "fail to comply with the terms of its charter with reference to the completion of" its road to San Antonio within a stated time? (Special Act July 27, 1870; Special Act March 10, 1875; Ordinance of Convention of 1875, Sayles' Constitutions, p. 599.) Has there been any legislation since the ordinance cited which granted relief to the company with respect to the time of completing its road?

2. If the company did so fail, did the Act of August 16, 1876, entitle the company to receive lands for work done after the 21st of August, 1876, the day on which the first Legislature adjourned after the Constitution went into effect?

The briefs will be filed on or before 10 o'clock on 23d instant.

*E. P. Hill,* for appellant, on reargument.—Answer to first question: The appellant did not complete its road to San Antonio within the time fixed by its charter, viz., July 27, 1874. The Act of March 10, 1875, extended the time to January 28, 1876, and the effect of the ordinance of the Convention of 1875 was to extend the time to August 21, 1876, by which latter date the road was not completed to San Antonio. The only further extension claimed is under Act of March 15, 1875, hereafter referred to.

The second question raises a point not before raised in the case, either in the court below or in this court, and no argument seems called for on any point before presented in the brief for the State.

The proposition is there presented and urged, that because appellant did not complete its road in the time required, its charter was by its terms forfeited; but the language, "then this charter shall be forfeited," puts the case in that class where judicial proceedings are necessary to declare a forfeiture. The State v. Railway, 24 Texas, 80; Beach on

Priv. Corp., sec. 49; Mora. on Priv. Corp., sec. 1006; 2 Redf. on Rys., 587; Field on Corp., sec. 493.

Where the failure of the State to take such proceedings is a waiver: Beach. on Priv. Corp., sec. 59.

Moreover, there was an actual waiver by the Act of March 10, 1875, which extended the time to January 28, 1876, without attaching any condition of forfeiture in case of failure.

Article 4278, Revised Statutes, is not correctly quoted in brief for the State. The language of the article is, "If any railway corporation organized under this act," etc. The appellant company was not organized under that act.

That article, too, not only says "shall * * * forfeit its corporate existence," but also "its powers shall cease," so far as relates to that portion of the road unfinished. Said article is not pertinent to this case, nor is the case cited applicable.

An Act approved March 15, 1875, extended limitation of time for twelve months in addition to that given in charters or laws for completion of works of internal improvement. It is true that one of the provisos of this act is as follows: "Provided further, that this act shall not apply to any railway company in whose favor any special act may be passed extending the time of construction at the present session of the Legislature."

This proviso raises two questions. Does it exclude the Galveston, Harrisburg & San Antonio Railway Company on account of the fact that an act had been theretofore passed at the same session, viz., March 10, 1875, extending time to January 28, 1876? The Act of March 15, 1875, is certainly susceptible of a construction which would give the Galveston, Harrisburg & San Antonio Railway Company the benefit of it, for the benefit of this act is only withdrawn from railway companies "in whose favor any special act may be passed." This by its terms, and by reasonable construction of its terms, would refer to acts which might be subsequently passed—that is, which might be passed after March 15, 1875. No such act was passed in respect to the Galveston, Harrisburg & San Antonio Railway Company. Of course, if this construction is maintained the Act of March 15, 1875, adds twelve months to the time limit of the Galveston, Harrisburg & San Antonio Railway Company. This would be twelve months from January 28, 1876, which would practically cover the time of completion of the Galveston, Harrisburg & San Antonio Railway to San Antonio.

The Act of August, 1876, section 1, is as follows:

"*An Act to encourage the construction of railroads in Texas by donation of lands.*—Section 1. Be it enacted by the Legislature of the State of Texas: That any railroad company heretofore chartered, or which may be hereafter organized under the general laws of this State, shall, upon

the completion of a section of ten miles or more of its road, be entitled to receive, and there is hereby granted to every such railroad, from the State, sixteen sections of land for every mile of its road so completed and put in good running order; provided, that no company whose road is less than three feet gauge shall be entitled to receive any grant of lands under this section; provided further, that companies constructing railroads on the prismoidal plan shall be entitled to eight sections of land to the mile on the same terms as other roads; provided further, that this act shall not be construed to renew or continue any right to companies who have failed or may fail to comply with the terms of their charters, with reference to the completion of portions of their roads in stated times; provided further, the provisions of this act shall not be so construed as to grant the aid herein provided for to any railroad that has already received or is otherwise entitled to receive aid from the State to the amount of sixteen sections of land to the mile.''

In respect to rights of railway companies to acquire lands by reason of construction of road which may have been built out of time, there are the decisions of the Supreme Court of the United States upon that subject, the leading case being that of Schulenberg v. Harriman, 21 Wallace, 44. Notwithstanding the most positive provisions in respect of forfeiture in the event of nonconstruction within the prescribed time, a railway company is entitled to draw lands against railroad built out of time, unless in the case of office-found or judicial determination of forfeiture, or at the least a statutory declaration of the exercise of the right of forfeiture after the right to forfeit has accrued. Under congressional land grants it is the well settled law that notwithstanding limitations and the most positive terms of forfeiture attached to limitations, companies are entitled to lands for road completed before the judicial decree of forfeiture or legislative exercise of an accrued right of forfeiture.

Under article 4270 the right which is not to be construed to be renewed or continued is the right to acquire lands and not the right to build roads. The theory of the act is, that if a company has had a land grant in respect of its line, and has failed to comply with the terms of its charter with reference to completion of portions of its road in stated times, this chapter should not be construed to renew or continue the right to acquire lands in respect of the same. This could not be applicable to a corporation which had never had the right to acquire lands in respect of the road in question, and in respect of which, therefore, there was no right which could by any possibility be renewed or continued. In respect of such a line the provision as to renewal or continuance could not be applicable, and there is no proviso which in anywise impairs the effect of the act as a fresh grant except the statement in the last clause that it shall not operate as a fresh grant when a road

has already received or is otherwise entitled to receive aid to the amount of sixteen sections of land to the mile. There is nothing in the act which withdraws the grant therein contained from any company which, not having had a land grant at all in respect of its line, had failed to complete it within the prescribed time. The theory of the act seems clear upon its terms and reasonable in its provisions, that if a company had had a grant and had failed to build its road in time the grant should not be renewed or continued by this act. If it had not had such a grant, there was every reason why it should be given a reasonable opportunity to build the road under the inducement of the grant, and in view of the benefits and advantages to be derived therefrom; that is to say, in consideration of the premium which the State at that time considered it desirable to offer in order to secure construction of roads.

Article 4270 provides that it shall not be construed to renew or continue any right to any company which has failed or may fail to comply with the terms of its charter with reference to the completion of portions of its road in stated times. That could not be applicable to appellant, because it then had no right to earn lands which might or could be renewed or continued. If there was no right which could by any possibility be renewed or continued, this proviso could not of course affect the appellant if it were in the position of having no right to earn lands.

The meaning of this section of the Revised Statutes would seem to be, that if, notwithstanding it had a land grant, a company had not built its road in time, this act should not renew or continue it; if it already had a grant, this act should not give it another. Neither of these affects a company in the position which appellant occupied in respect to the Columbus to San Antonio line, viz., that it did not have and never had had a land grant in respect thereto.

*Chas. A. Culberson*, reargument.—In response to the order of the court, I herewith submit an additional brief on the points suggested, taking up the two propositions in their order.

1. "Did not the appellant company fail to comply with the terms of its charter with reference to the completion of its road to San Antonio within the stated time? Has there been any legislation since the ordinance cited which granted relief to the company with respect to the time of completing its road?"

As shown in the brief heretofore filed, by the Act of July 27, 1870, which created the appellant company, it was required under pain of forfeiture of its charter to complete its road to San Antonio within four years. The admitted facts show that the road was not completed until the 13th of February, 1877. The Act of March 10, 1875, granted the company until January 28, 1876, to complete the road, and the ordi-

nance passed by the Constitutional Convention of 1875 extended the
time to the close of the next session of the Legislature, which was the
21st of August, 1876.    It will be observed, therefore, that conceding
the validity of the Act of 1875 for the purpose of extension, and also
giving full effect to the ordinance referred to, the charter of the com-
pany was nevertheless forfeited because it failed to construct its road
by the 21st of August, 1876.    I have examined all the laws passed
since 1876, and have been unable to find any statute which grants
further time for the completion of this road.    Certainly the Act of
August 16, 1876, does not grant relief to this company, but on the con-
trary, by section 1, which is carried into the Revised Statutes as art-
icle 4270, it is expressly provided that "this act shall not be construed
to renew or continue any right to companies who have failed or may
fail to comply with the term of their charters with reference to the
completion of portions of their roads in stated times."    So far as I am
advised, no act for the relief of railway companies was passed be-
tween 1876 and 1885 except the Act of 1879 (Special Session 1879, p.
47), which does not apply; but by the act of that year, approved March
27 (Gen. Laws 1885, p. 54), it was provided that limitations as to time
within which parts of a railway should be constructed, contained in
articles 605 and 4278 of the Revised Statutes, were suspended until
January 1, 1887.    This law, however, is certainly not applicable to
this railway company, for the obvious reason that article 605 refers
only to corporations created by general law, and article 4278 is also
thus limited.    The requirement that appellant company should com-
plete its road to San Antonio within the time named was not contained
in either of these articles or in any general law, but was a provision
contained in its own charter.    There was no relief act passed by the
Legislature of 1887, and the Act of 1889 (Gen. Laws 1889, p. 20), only
relieved companies chartered since the 1st of January, 1887; so also
the Act approved February 11, 1891, was for the relief of railway com-
panies having charters made or amended since the 1st of January,
1887.    Gen. Laws 1891, p. 5.

"2.    If the company did so fail, did the Act of August 16, 1876, en-
title the company to receive the lands for work done after the 21st of
August, 1876, the day on which the first Legislature adjourned after the
Constitution went into effect?"

It is submitted that this law did not authorize appellant to receive
lands, for the following reasons:

(1)    The ordinance referred to extended the time after the comple-
tion of the road to the 21st of August, 1876.    The company did not
comply with this relief act, but on the contrary failed to complete the
road as stated until February 13, 1877.    The Act of 1876 did not go
into effect until ninety days after adjournment, and consequently be-

fore it became operative, even under the ordinance of 1875, the charter of the company had become forfeited.

(2) It is expressly provided in section 1 of the Act of 1876 that "this act shall not be construed to renew or continue any right to companies who have failed or may fail to comply with the terms of their charters with reference to the completion of portions of their roads within stated times." It is plain that if full effect be given to the ordinance of the Constitutional Convention the company is not entitled to lands under this act, because the exception expressly applies both to companies "who have failed or may fail to comply with the terms of their charters," and certainly if the charter had not then become forfeited it thereafter became so.

(3) The charter of the company having become forfeited the company could not earn or acquire the land. It was dissolved for all purposes except what might be necessary to wind up its affairs. Saltmarsh v. Bank, 17 Ala., 766; 3 Wood Ry. Law, p. 1715, sec. 500; 2 Mora. on Corp., sec. 768; In re Railway, 72 N. Y., 245; Bank v. Colby, 21 Wall., 615; Thornton v. Railway, 123 Mass., 32; Ins. Co. v. Bank, 68 Ill., 350.

GAINES, ASSOCIATE JUSTICE.—This suit was brought by the State of Texas, through its Attorney-General, to recover of the appellant corporation sixty sections of land which had been located and surveyed for it by virtue of sixty alternate certificates issued July 12, 1877, to the company by the Commissioner of the General Land Office.

The grounds of action as alleged in the original petition are as follows:

"1. That said certificates were claimed to be issued and located, as shown upon their faces, in accordance with the provisions of 'An act to encourage the construction of railroads in Texas by donations of lands,' approved January 30, 1854, and acts amendatory thereof; all of which said laws had expired by their own terms and limitations, and were repealed by other acts of the Legislature and by the Constitution of 1869, before the road for which said certificates were issued was constructed.

"2. That the company in procuring said certificates represented, and on said representation obtained them for and on the ground, that said company had completed at the date of their issuance a section of thirty-six miles and 1474 feet of main track from the Guadalupe Bridge to San Antonio, and two miles and 2000 feet of sidings and switches at other points on its line, making a total of thirty-eight miles and 3474 feet of railway. That on this representation and statement, which were untrue, the certificates were issued. That there were not then in fact, nor have there ever been, thirty-six miles and 1474 feet of main track between said Guadalupe Bridge and San Antonio; but that the distance between those points has always been, and is now along the main track of said railroad, only thirty miles and 1205 feet, which said company then knew and has always known. That for the said distance of

thirty miles and 1205 feet of main track the defendant company falsely, fraudulently, and unlawfully obtained, received, and appropriated to its use sixteen land certificates of 640 acres each to the mile for thirty-six miles and 1474 feet of alleged main track, as shown upon the face of said certificates; and in that way unlawfully and fraudulently received sixteen sections of 640 acres of land each to the mile for six miles and 269 feet more from the State than the actual mileage of said road between the said Guadalupe Bridge and San Antonio.

"3.    That the two miles and 2000 feet of sidings and switches called for in and shown on the face of said certificates belonged to and were a part of other sections of defendant's road at the following points, to-wit:    At Flatonia, 1200 feet; at Quarry track, near Flatonia, 6600 feet; at Eagle Lake, 500 feet; at New Philadelphia, 1400 feet; at Pierce Junction cattle track, 1460 feet; making a total of sidings and switches of 12,560 feet, or two miles and 2000 feet. That of the thirty-six miles and 1474 feet mentioned and represented on the face of the certificates as main track, six miles and 269 feet of the same were in truth and in fact not main track, but sidings and switches at points between the Guadalupe Bridge and San Antonio.    That the certificates hereinbefore mentioned and described were in fact issued for eight miles and 2269 feet of switches and sidetracks, for the construction of which the said company was not entitled to aid from the State in any amount or quantity of land, either under general or special laws.

"4.    That said railway was constructed and completed westward from the Guadalupe Bridge to San Antonio as aforesaid between the 17th day of November, 1876, and February 13, 1877; and the said two miles and 2000 feet of sidings and switches mentioned in said certificates were built by said company between April 1, 1870, and April 18, 1876, and were the sidetracks, switches, parts, parcels, and appurtenances of and belonging to other portions and sections of defendant's railway at the points hereinbefore named lying eastward of said Guadalupe Bridge, for the construction of which said company had at other and previous times unlawfully obtained, abused, and appropriated from the State sixteen sections of land to the mile thereof.

"5.    That six miles and 269 feet of sidings and switches called for and contained within but not shown upon the face of the aforesaid certificates and for which they were to that extent issued, and also the two miles and 2000 feet of sidings and switches shown upon the face of said certificates and for which they were issued, were at the time of the issuance of said certificates and at all other times prior to and since said dates necessary appurtenances to and adjuncts and parts of the defendant's railway, and were essential to the use and operation of said railway.    That said railway at no time was or could have been complete and in good running order without said sidings and switches. That without them said railway was not substantially built or fully

equipped for the transportation of passengers or freight or either, nor would said road without them have been constructed in accordance with its charter or the general laws in force in this State regulating railways.

"6.    That it can not be ascertained from the face of said certificates, or from the location and survey of said lands, or by any other means, which of these certificates were issued, located, or surveyed exclusively on account of the main track of said railway."

The prayer of the petition was for a recovery of the lands and a cancellation of the certificates.

The defendant company in a special answer denied that in procuring the certificates it had misrepresented the number of miles of main track and the number of miles of sidetrack for which they were issued; and alleged that they were issued upon a correct report made by the engineer of the State and approved by the Governor; and that by a clerical error which was made in the Land Office an erroneous recital as to the respective numbers was inserted in the face of the certificates. The answer contained other averments, which it is not necessary to notice.

A supplemental petition was filed on behalf of the State, which contained these allegations:    "The State says the defendant was never entitled to receive the lands in controversy or any other lands in aid of constructing its railway west of the Guadalupe Bridge, for the reason that by the terms of its charter, passed July 27, 1870, and the amendment passed March 10, 1875 (mentioned in plaintiff's petition), which are referred to and made a part hereof, it was required and undertook to complete its said railway to San Antonio on or before January 28, 1876, conditioned that in the event of its failure to do so it should forfeit all the corporate rights, powers, and privileges therein conferred. That it failed to so construct or complete its said road to said place within said time, on or before January 28, 1876, and therefore it ipso facto by the terms of its said charter contract, which the State here specially interposes, pleads, and demands to be enforced, lost and forfeited all its rights and all privileges, immunities, and grants of land, if any it ever had, held, or was entitled to, by virtue thereof."

Under the rules of practice prescribed by this court, these averments should properly have been made as amendments to the original petition; but they were not excepted to on that ground, and the objection is deemed to have been waived.

The case was tried before the judge without a jury, upon an agreement as to the principal facts, which are as follows:

"1.    That defendant received from the State 619 land scrip certificates for 640 acres each, all of which is located on public domain, each of said certificates being in form and substance as exhibit A, hereto attached.

"2. That the defendant's main line of track from the Guadalupe Bridge west to San Antonio, mentioned in each of said certificates, is thirty miles and 1205 feet; and the sidings and switches between same points is six miles and 269 feet, as will more fully appear by exhibit B, attached hereto.

"3. That the two miles and 2000 feet of sidings and switches mentioned in each of said certificates were east of Guadalupe Bridge, as more fully appears by exhibit C, hereto attached; and that prior to the issuance of said certificates, the defendant or its predecessor received sixteen sections of land of 640 acres each for the main track to which said sidings and switches belonged east of said Guadalupe Bridge.

"4. That the lands described in plaintiff's petition were located and are now held without patents by the defendant by virtue of said certificates according to the number and description set forth in said petition.

"5. Correspondence between Governor Hubbard and Attorney-General Boone, hereto attached, marked exhibit D, may be introduced subject to objections as to its legal effect.

"6. The charters and special laws relating to defendant company may be used on the trial in evidence.

"7. Any other pertinent fact may be introduced in evidence by either party on the trial.

"8. That there now remains belonging to the State 4,500,000 acres of the public domain reserved since 1879 from location by certificates, and was at the time of the completion of said road to Del Rio.

"9. That defendant paid taxes on the land sued for continuously since they were located up to the present time.

"10. That defendant paid all fees for surveying and locating said lands sued for, as well as the same number of alternate sections, known as even numbers, for public free school fund.

"11. The various engineers appointed by the different Governors to inspect railways as the same were constructed, in their respective reports of inspection to the respective Governors, stated the number of miles and feet of main track, the number of miles and feet of sidings, the number of miles or feet of bridges, culverts, and trestles, the number of depots, cars, engines, weight of iron, and width and character of track and grade. The action of the respective Governors (except Governor Roberts) in said reports were usually in the following words, 'Report examined and approved,' upon which reports and action of the respective Governors the Commissioner of the General Land Office issued to the respective companies the certificates for main track and sidings, in form as shown in exhibit A.

"During the administration of Governor Roberts the reports of the engineers were in substance and form of those made to other Govern-

ors, but he approved for only the number of miles of main track stated in the reports. In one instance during the administration of Governor Davis he approved one report for sidings exclusively, for which certificates were issued in the usual amount per mile. This was also done in one instance by Governor Hubbard, as shown by exhibit C, for which certificates were issued. On March 13, 1877, Governor Hubbard made the following indorsement on one of the reports: 'This report of Inspector Gray examined and approved for thirty miles main track and sidings, as being made, graded, and in all respects complying with the law.'

"12. Exhibits E and F are copies of letters of Governor Coke, written to the Commissioner of the General Land Office, and G the letter of Governor Pease, March 30, 1856, to the Commissioner of the General Land Office, and H, March 24, 1856, Tipton Walker to Governor Pease, to be introduced.

"That the road of defendant from the Guadalupe Bridge to San Antonio, for which the certificates described in the petition were issued, was constructed and completed between November 17, 1876, and February 13, 1877. That the two miles and 2000 feet of sidings east of the Guadalupe Bridge were constructed and completed subsequent to October 31, 1876, and prior to February 13, 1877. This admission is subject to correction by defendant as to dates."

The following is so much of the form of the certificate referred to in the above statement as is material:

"No. 1621—LAND SCRIP—640 ACRES.

"THE STATE OF TEXAS, GENERAL LAND OFFICE,
"AUSTIN, TEXAS, July 12, 1877.

"This certificate entitles the Galveston, Harrisburg & San Antonio Railway Company to 640 acres of land, to be located upon any of the vacant and unappropriated public domain of the State of Texas, in accordance with the provisions of an act to encourage the construction of railroads in Texas by donations of lands, approved January 30, 1854, and acts amendatory thereof. Information having been received as required by said act that said company has completed a section of thirty-six miles and 1474 feet of main track from the Guadalupe Bridge to San Antonio, and two miles and 2000 feet of sidings and switches, making a total of thirty-eight miles and 3474 feet of railroad, in accordance with the provisions of its charter and general laws regulating railroads," etc.

The exhibits attached to the agreement are incorporated with it in the statement of facts, but their contents need not be set out in this connection.

The judgment was that the State recover the lands and that the certificates be canceled. It was predicated upon the following findings of fact and conclusions of law. As matters of fact the court found:

"1. That defendant constructed its line of railway from the Guadalupe Bridge west to San Antonio; that the distance between these points of railway is thirty miles and 1205 feet of main track, and the sidings and switches between the same points are six miles and 269 feet.

"2. That defendant railway also constructed two miles and 2000 feet of sidings east of the Guadalupe Bridge.

"3. That the defendant received from the State sixteen land certificates for 640 acres of land for each mile of the main track mentioned above, and sixteen land certificates for 640 acres each for each mile of its sidings and switches mentioned above, all of which have been located upon the public domain, included in which are the sections sued for.

"4. That the certificates show on their faces that they were issued for main track and for sidings and switches, but do not show which certificates were issued exclusively for main track and which were issued exclusively for sidings and switches."

The court also concluded as matters of law:

"1. That the law granting lands in aid of railways did not grant certificates for sidings and switches, but for main track only.

"2. The certificates showing on their faces that they were issued for sidings and switches as well as for main track, were issued without authority of law.

"3. That the State is entitled to judgment canceling the certificates and recovery of the land."

The appellant assigns, (1) that "the court erred in its conclusions of law in holding that the laws granting lands to railways did not grant lands for sidings and switches, but for main track only;" (2) that it "erred in adjudging the land certificates to be null and void and that they be canceled and held for naught."

The findings of fact are not called in question upon this appeal.

The Attorney-General, however, submits in effect that by reason of its delay in constructing its road to San Antonio the appellant did not acquire the right to any lands, and that the judgment should therefore be affirmed without reference to the correctness of the legal conclusions announced by the judge. If the judgment be correct, the fact that the court gave a wrong reason for it is not a ground for its reversal. The right of the company to receive certificates for the extension of its road is the foundation of its claim; and whether such was its right or not is logically the first question in the case, and will be the first determined.

Before proceeding to the discussion it is to be remarked that we construe the agreement as to the facts to mean that the special acts of the Legislature bearing upon the questions involved are to be considered as if offered in evidence before the court and to be treated as laws of which the court takes judicial knowledge. The briefs of counsel refer to them freely, and no objection is made from either side.

The certificates in controversy in this case purport upon their face to have been issued by virtue of the Act of January 30, 1854, and acts amendatory thereof; but the Attorney-General contends, and counsel for appellant seems to concede, that the authority to issue the certificates, if it existed at all, was conferred by the Act of August 16, 1876. Laws 1876, p. 153.    The Attorney-General insists, however, that before this act took effect the appellant's charter had been forfeited and had become void, and that it had been thereby rendered incapable of receiving a grant of lands.    If the charter had become void at the time the Act of August 16, 1876, went into effect, it may be readily conceded that the company acquired no right under that act.    By a special law passed July 27, 1870, entitled "An act supplementary to an act to incorporate the Buffalo Bayou, Brazos & Colorado Railway Company, and to the other special acts relating to said company," the present corporation was recognized as the successor by a foreclosure sale to the property and franchises of the original corporation named in the title, and the name was changed to that of the Galveston, Harrisburg & San Antonio Railway Company.    Section 3 of that act provided:

"That said new company is hereby authorized to extend the existing line of railroad owned and operated by said company from Columbus, in Colorado County, to San Antonio, in the county of Bexar, within four years from the passage of this act, and thence to the terminus on the Rio Grande by such route as the directors shall deem most feasible, with a branch from the most suitable point to New Braunfels, in Comal County, within four years from the passage of this act; or said new company may connect with any line of railroad that may be constructed or under construction to San Antonio or the Rio Grande south of the latitude of the city of Austin and the Colorado River, instead of building its own line beyond the point of such connection; and may build it and connect with any line of railroad that may be constructed or under construction and designed to form a part of any railroad line to the Pacific south of the thirty-fifth parallel of latitude; nothing herein being so construed as to exclude said new company from the right to construct also any part of the line up the Colorado Valley formerly designated by said "sold-out" company as its route under the provisions of the eleventh section of the Act of December 19, 1857; provided, that if the said road shall not be completed within the time specified in this section, then this charter shall be forfeited."    Spec. Laws 1870, p. 45.

By this it will be seen that the company was required to construct its road to San Antonio on or before the 27th day of July, 1874, upon penalty of forfeiting its charter.    But by a special act passed March 10, 1875, the time was extended to the 28th day of January, 1876.    By virtue of "An ordinance in relation to railroads," passed by the Convention of 1875, the time was in effect extended until the adjournment

of the next Legislature. 4 Sayles' Stats., 599. That adjournment took place on the 21st day of August, 1876. General Laws 1876, p. 321. The appellant's road was not completed to San Antonio by the last named date, and it is insisted that by reason of the company's failure in this respect its charter ipso facto ceased to exist. It is universally held as a general rule that the forfeiture of the franchises of a corporation can·not be claimed in a collateral proceeding merely because a ground of forfeiture may exist. The forfeiture must be declared in a judicial proceeding instituted for that purpose. Whether such proceeding shall be taken or not depends upon the will of the State, for it has the election to enforce the forfeiture or to waive it. When the rights of the corporation come into inquiry in a collateral proceeding, the case is to be treated as if no ground of forfeiture existed unless there has been a judgment so declaring in a direct action by the State. Matter of Elevated Railway, 70 N. Y., 337; Montgomery v. Merrill, 18 Mich., 343; Moseby v. Burrow, 52 Texas, 396; Railway v. Johnson, 49 Mich., 148; Stoups v. Plank Road Co., 10 Ind., 47; Heard v. Talbot, 7 Gray, 113; Bohannon v. Burns, 31 Miss., 355; Baker v. Admr. of Backus, 32 Ill., 79; Dyer v. Walker, 40 Pa. St., 157; West v. Ins. Co., 31 Ark., ·476; Penobscot Corporation v. Lamson, 16 Me., 224; Enfield Toll Bridge Co. v. Connecticut River Co., 7 Conn., 45; Briggs v. Canal Co., 137 Mass., 71. This rule applies as well when the ground of forfeiture is expressed in the charter as when it is merely implied, as some of the cases cited will show.

We do not mean to assert that the State in granting a charter can not prescribe conditions upon the performance of which the continued existence of the corporation may be made to depend, and that it can not make the failure to perform the conditions operate of itself and without judicial action a divestiture of the corporate privileges. A compliance with the conditions prescribed by article 4278 of the Revised Statutes in reference to railway companies organized under the general law was held by this court necessary to prevent a termination ipso facto of the corporate existence in whole or in part of such companies. Bywaters v. Railway, 73 Texas, 627. The words "forfeit its corporate existence and its powers shall cease," etc., in the article cited, were held to import that the provision should be self-executing. Similar language in the statutes of other States has received a like construction. Railway v. Railway, 45 Cal., 365; Matter of Brooklyn Railway, 72 N. Y., 245. When apt words are used to express the intention that the forfeiture shall take place upon the happening of a contingency without the necessity of a judicial declaration, then the courts will give effect to that intention whenever the question is presented in a judicial inquiry. But the language employed in the charter under consideration is that upon the failure of the company to construct its road to San Antonio within the prescribed time, "then this charter shall be for-

feited.'' It is to be noted that the language quoted neither prescribes nor indicates the manner of forfeiture. In cases where such words are employed the uniform construction is that they prescribe a ground of forfeiture, and that the manner must be by a judicial proceeding instituted directly for that purpose. We doubt if any case can be found in which the words "shall forfeit its charter," or "its charter shall be forfeited," have been construed to provide a forfeiture which is to take effect by the mere happening of a contingency. In that connection the term "forfeit" has been imbued with a technical signification, and is the word universally used in charters for prescribing the grounds upon which a judicial forfeiture may be claimed. This is illustrated by the article of the Revised Statutes above cited (art. 4278), and article 4280 in the same chapter. Article 4278 provides that upon the failure of the railways organized under that title to build certain sections of the road as therein provided, the corporation shall "forfeit its corporate existence and its powers shall cease as far as it relates to that portion of said road then unfinished, and shall be incapable of resumption by any subsequent act of incorporation." Article 4280 provides that any railway corporation that shall neglect to make its annual report as required by law after being notified by the Comptroller, "shall forfeit its charter." The change in the language clearly shows the intention of the Legislature. By the former article it intended to provide a forfeiture without judicial action for a failure to complete so many miles of railway within stated periods. By the latter the intention was to prescribe merely a ground of forfeiture which the State could enforce should it so elect by a direct proceeding in a court of justice.

The Supreme Court of Massachusetts has held that where a charter provides that in case the corporation fails to comply with its provisions "this corporation shall thereupon cease to exist," it can only be determined that it has ceased to exist in a suit brought directly to declare the forfeiture. Briggs v. Canal Co., 137 Mass., 71, and cases cited. This is in conflict with the decision of this court in Bywaters v. Railway, supra, from which we have no disposition to recede, but it supports our conclusion as to the effect of the words, "then this charter shall be forfeited," in the special act of incorporation now under consideration.

For the reasons given we conclude that the appellant must be treated as operating under an existing charter on the 19th day of November, 1876, the day on which the Act of August 16, 1876, went into effect. This brings us then to the construction of that act.

Omitting certain provisions which throw no light upon the question before us, the act reads as follows:

"That any railroad company heretofore chartered or which may be hereafter organized under the general laws of this State shall, upon the completion of a section of ten miles or more of its road, be entitled to

receive, and there is hereby granted to every such railroad, from the State, sixteen sections of land for every mile of its road so completed and put in good running order; * * * provided further, that this act shall not be construed to renew or continue any right to companies who have failed or may fail to comply with the terms of their charters with reference to the completion of portions of their roads in stated times; provided further, that the provisions of this act shall not be so construed as to grant the aid herein provided for to any railroad that has already received or is otherwise entitled to receive aid from the State to the amount of sixteen sections of land to the mile."

It is clear, we think, that the appellant company is included within the meaning of the words "any railroad company heretofore chartered," and that it was entitled to receive lands for portions of its road constructed after the act went into effect, unless it be excluded by the first proviso which appears in the section quoted. The construction of that act as applicable to the work done by the appellant company presents a serious difficulty. We think the proviso should be construed as if it read, "this act shall not be construed to renew any right to companies that have heretofore failed, or to continue any right to companies that may hereafter fail, to comply with the terms of their charters," etc. If the company had ever had the right to a grant of lands for constructing its road to San Antonio, having at the time the act took effect failed to comply with the law for building to that point within the time fixed by its charter, the acts amendatory thereof, and the general laws which granted relief to said railway companies in that particular, it was in effect excluded by the proviso from the benefit of the act.

The Buffalo Bayou, Brazos & Colorado Railway Company had by special acts and by the general law of 1854 the right to receive lands for each section of twenty-five miles of railway constructed, but by a special act of February 4, 1854, it was restricted to an extension of its road to Austin, and to a line extending thence to a connection with any road running north of Austin to the Pacific Ocean. Spec. Laws 1854, pp. 69, 70. The privilege of constructing a railway to San Antonio was conferred by the special act of 1870, which recognized the present corporation as the successor of the Buffalo Bayou, Brazos & Colorado Railway Company, and authorized the change of name. At the date of that act the power to grant lands in aid of the construction of railways had been taken from the Legislature by the Constitution of 1870, and all laws making such grants impliedly repealed except as to existing rights. Const. 1870, art. 10, sec. 6. It follows that until the act of 1876 went into effect the appellant had never had any right to acquire lands from the State by the construction of its line to San Antonio, and consequently there was no right in that respect which but for the proviso in question would have been renewed.

Does, then, the appellant corporation come within the meaning of the words "companies who * * * may fail," as found in the proviso? If the statute is to be construed as speaking from the time it took effect, and not from the date of its passage, then the appellant is not included. It had already failed to comply with the law with reference to building to San Antonio when the act went into effect. At the date of the passage of the statute it had not failed. It still had until the adjournment of that session of the Legislature to complete its road to the point named in compliance with the laws. We apprehend that no universal rule of construction can be adopted when a statute which makes a distinction between future and past transactions is passed upon one day to take effect upon another, but we think the general rule is that a statute speaks from the time it becomes a law, and that what has occurred between the date of its passage and the time it took effect is deemed with respect to the statute a past transaction. This is in analogy to the rule for the construction of wills. Price v. Hopkins, 13 Mich., 318; Charles v. Lamberson, 1 Clark (Iowa), 442; City of Davenport v. Railway, 37 Iowa, 624; Gilkey v. Cook, 70 Wis., 133; Jackman v. Garland, 64 Me., 133; Railway v. Barbee, 74 Ind., 169. This rule should not be applied when the language of the act shows a contrary intention. But we find nothing in the statute under consideration which evinces an intention that the date of its passage rather than that on which it was to take effect was to be considered the dividing point between the future and past failures contemplated in the proviso.

Our conclusion being that the appellant company had never acquired any right to earn lands by the construction of this particular line of road before the passage of the Act of August 16, 1876, and having already failed to construct to San Antonio within the time required by its contract and the general laws of the State, it follows that the privilege conferred by that act was neither a renewal of a lost or forfeited right nor the continuance of one existing when the act took effect. The appellant therefore is not excluded by the letter of the statute from benefits conferred by it. Whether it comes within the spirit of the proviso or not is not so clear. The Legislature may have intended to exclude from participation in the land grant all companies that had made default in the particular mentioned in the proviso, or it may have intended to exclude only those in default to whom the State's bounty had been extended. There was reason for making a distinction between those who had failed without the land grant and those who defaulted notwithstanding the very liberal terms which had been offered them by the State as an inducement to complete their works in accordance with the terms of their charters. The default of such companies was of a graver character than that of those to whom the right to acquire land had never been extended. The provision in reference to companies that had an existing right to acquire lands and that might fail in future,

is in harmony with the same idea.   Being aided by a grant of lands, they were required to build in accordance with their charters, under penalty in case of default of losing the benefits of the act.

For these reasons we strongly incline to the opinion that railway companies who had failed to comply with the law in regard to the construction of their roads within specified times, and who had not been entitled to participate in the State's bounty, were not intended to be excluded from the benefits of the statute under consideration.   But it may also be remarked that in the years 1875 and 1876 the people of those sections of the State which were still without railways complained loudly of the policy which had led to the prohibition of grants of the public domain to aid in the construction of these public improvements, and that they condemned as unfair the repeal of the law before those portions of the State had enjoyed any benefit from it in the way of securing facilities for transportation.   The complaint was certainly well founded, and it may be that these considerations may have induced the Legislature to deprive no company with an existing charter of the benefits of the act to whom a right to acquire lands had never been extended.

But whether we are correct or not in these conclusions, there is certainly such doubt about the meaning of the proviso in question as to justify us in calling in aid the practical construction placed upon it by the executive department of the government.   The evidence in the case shows that the certificates were issued upon the report of the State inspector, which was approved July 9, 1877, by R. B. Hubbard, then the Governor of the State.   The Governor before acting on the report requested the opinion of the Attorney-General upon the question of the right of the company to receive lands under the Act of August 16, 1876, and called attention to the fact that the company had failed to complete its road to San Antonio within the time prescribed in its charter.   The opinion of the Attorney-General was that the company was entitled to receive certificates for lands under the act in question. It appears incidentally in the correspondence between Governor Hubbard and the Attorney-General that the immediate predecessor of the former had made the same ruling.

We are brought then to the original question in the case, Did the Act of August 16, 1876, entitle the appellant company to receive lands for the construction of its sidings?   The language of the statute in so far as it bears upon this question is: "That any railroad company heretofore chartered or which may be hereafter organized under the general laws of this State shall, upon the completion of a section of ten miles or more of its road, be entitled to receive, and there is hereby granted to every such railroad, from the State, sixteen sections of land for every mile of its road so completed and put in good running order."   As we view the provision a solution of the question will be facilitated by first

determining what is meant by the words, "a section of ten miles or more of its road." When we speak of a section of ten miles of railway, do we mean ten miles of road in lineal extension, or do we mean ten miles of track made up together of the main line and of sidetracks used in connection with it? Could a railway company lawfully claim lands under the act for the completion of eight miles of a line of road and two of sidetrack? Each of these questions fairly admit of but one answer. A section of ten miles of a railway obviously means a section of its road extending ten miles in a continuous line. Less than ten miles of the line of the road with sufficient sidetracks used in connection therewith to make up ten miles do not constitute a section of ten miles of railway. A section of ten miles means a section ten miles long, and it can not without doing violence to the words be tortured into meaning anything else. This is too plain to admit of argument.

Having determined that a section of ten miles means a portion of the line of the road ten miles in continuous length, we then have the question, What is meant by the subsequent words, "be entitled to receive * * * sixteen sections of land for every mile of its road so completed," etc.? Does it mean that the companies were to receive lands for every mile of such section? or does it mean they are entitled to receive them not only for every mile of the section but also every mile of sidings constructed therewith? We are of the opinion that the former is the only proper construction that can be given to the words. Upon the completion of a section of ten miles or more of railway the companies are to receive a certain quantity of land for every mile of its road so completed. The words, "every mile of its road so completed," clearly refer to the section and nothing else. Can it be contended that upon the completion of a section of ten miles a company would be entitled to receive lands for every mile of road completed by it on some other portion of its lines? and if not, upon what theory can sidetracks be construed to be within the purview of the statute when they are not mentioned by the distinctive appellation by which they are commonly known? It is true that sidetracks are necessary appurtenances to every railway constructed for public use, but the deduction from this is not that the Legislature intended to grant lands for their construction, in the absence of words in the statute evidencing that intent. It is rather that it was intended to induce by a compensation in lands the construction of the line of railway proper, knowing that the construction of the sidings would follow as a necessary incident of the main enterprise. It was not the purpose to confer a mere bounty. It was to grant lands as a consideration to induce the extension of existing lines of railway, and the construction of new lines. The good to be accomplished was not the increase of railway facilities by the construction of sidetracks, but the projection of the railways themselves into those sections of the State that were without the facili-

ties of transportation. The extension of railways was what was desired, and it is to be presumed that to secure these ends was the object for which the lands were granted. It is therefore a reasonable conclusion that it was intended in computing the mileage for which the lands were to be granted to take into account the miles of lineal extension only. Both the letter and spirit of the act clearly indicate to our minds that such is its only proper construction.

But it is insisted that in determining this question we should be governed by the construction of the statute acted upon by the executive department of the State government, and it is claimed that "during the administration of Governor Pease and on down through all administrations, engineers appointed by the Governors for that purpose examined and measured the roads as constructed from time to time, made their reports of number of miles of main and side track, which reports were examined and approved by the Governors, and the Commissioners of the General Land Office issued certificates and patents for land for both side and main track, and in two instances reports were made and approved for sidetrack alone."

But it must be borne in mind that prior to 1876 the certificates were issued and grants of land made to railway companies by virtue of the Act of January 30, 1854. Pasch. Dig., art. 4945, et seq. The first section of that act reads as follows: "Any railroad company chartered by the Legislature of this State heretofore or hereafter constructing within the limits of Texas a section of twenty-five miles or more of railway shall be entitled to receive from the State a grant of sixteen sections of land for every mile of road so constructed and put in running order." It must be conceded, we think, that this language in so far as the question before us is concerned is substantially the same as that contained in the granting clauses of the act under consideration. But the twelfth section of the Act of 1854 contained the following language: "The provisions of this act shall not extend  *  *  *  to any company for more than a single track road with the necessary turnouts." This provision is not contained in the Act of August 16, 1876. Its meaning is not clear to our minds. Whether it was intended to be merely descriptive of the railways which should be empowered to receive the grants, or whether it was intended to grant lands for the sidings, we are not called upon to decide. It must be conceded, however, that it admits of the latter construction, and affords a reason for the interpretation placed upon the act by the executive officers of the State, which without it would not be apparent to our minds. The construction of that act, therefore, does not aid us in construing the latter statute. The omission from the latter act of the language quoted does not tend to support the construction claimed by appellant. The failure to insert it, if entitled to any weight, tends rather to the opposite conclusion. It may have

been omitted with a view to deny the right to receive lands for the turnouts.

It is true, however, as claimed, that reports for sidings were approved by Governor Hubbard under the Act of 1876, and that certificates therefor were issued by the commissioners; but it is also true that Governor Roberts refused to approve the State inspector's reports in so far as they embraced the mileage of the sidetracks. But conceding for the sake of the argument that the construction of the Act of 1876 by the executive department has been uniformly favorable to the claim of the appellant, does it follow we are to be guided upon this question by that construction? We recognize the rule that in cases of doubt the contemporaneous construction of any department of the government is entitled to great weight, and is sometimes given a controlling influence. That rule we have applied in construing another statute in the present case. But it seems to be well settled that when the meaning of the language in a statute is clear it has no application. Suth. on Stat. Con., sec. 307, et seq. If the words contained in the act under consideration were of doubtful meaning we could not lightly disregard the construction given them by the officers of the State who were called upon to act upon them. But their import appears too clear to admit of any reasonable doubt. We are constrained, therefore, to follow our own convictions, regardless of the views manifested by the acts of the officers of the executive department, and to hold that the appellant was not entitled under the Act of 1876 to receive lands for its sidetracks.

But did the facts that more certificates were issued to the appellant than it was entitled to receive, and that those issued for the sidings were not distinguishable from those issued for the lineal extension of the road, justify the court in holding all the certificates void and rendering a judgment in favor of the State for a recovery of all the lands? There was no concealment, artifice, or fraudulent device of any character in procuring the certificates for the sidings. The mileage of the sidetracks was reported as such by the State's inspector and the report was approved by the Governor. The certificates for the sidings were openly demanded and were issued by the Commissioner of the General Land Office without question under what might reasonably have appeared to him the uniform ruling of his office. Even admitting that fraud would vitiate the entire issue of the certificates into which the computation for the sidings entered (a doctrine we are not called upon to announce), that rule would not sustain this judgment. This is a case of an excessive grant wholly untainted by fraud. The case of Maxey v. O'Conner, 23 Texas, 234, was similar in principle to this. It involved a question of excess in a grant of lands to Powers & Hewitson under their colonization contract. In that case the court say: "If the grant was excessive, as contended, and the grantees actually received title, whether in one tract by one title of possession or in dif-

ferent tracts by several titles, to more land than they had the right to demand for the number of families introduced by them, it is not perceived that the case is·different in principle from any other excessive grant. The excess does not render the grant void *in toto,* but only voidable at most by the government.'' The same doctrine was recognized by the Supreme Court of the United States in White v. Burnley, 20 Howard, 247, and it is unquestionably the law. The rule is manifestly just, and the remedy of the State is to reform the grant and to recover the excess. It follows that there is error in the judgment, for which it must be reversed.

What specific relief should be granted in each particular case we do not deem it proper to determine. There may be cases in which the rights of purchasers are involved, and the establishment in advance of any general rule might operate to influence a determination of these rights before they have had an opportunity of being heard. When certificates have been issued for sidings alone, the simple remedy is to declare them void and to give judgment for the recovery of the lands. When certificates for railroad proper and certificates for the sidetracks are blended in one series, and all the lands are still claimed by the company, the remedy would seem to be to reform the grants in one proceeding and to recover upon equitable principles the entire excess. When valid certificates only are issued the company has the right to select for their location any of the unappropriated public domain of the State which is subject to location under the constitution and laws of the State. Therefore in a proper case it would seem not inequitable to permit the company to select the lands it should be adjudged to retain and to give judgment for the State for what remains. It will operate no injustice to the State to permit that to be done, upon the final adjudication of the controversy, which the defendant had the right to do when it made its locations.

For the error pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Delivered June 27, 1891.