## GALVESTON, HARRISBURG & SAN ANTONIO RAILWAY COMPANY v. THE STATE OF TEXAS.

### No. 260.—Decided March 17, 1896.

### 1. Railroad Land Grant—Construction of Statutes.

The Galveston, Harrisburg & San Antonio Railway Company did not succeed to the land grant of the Buffalo Bayou, Brazos & Colorado Railway Company by virtue of the Special Act of July 12, 1870; said last named railway company having been restricted by special act of February 11, 1854, to run its line to Austin, and its successor constructing a different line. (Pp. 351 to 355.)

### 2. Same—Same.

If it were the right of the company under the existing laws to acquire lands by doing a specific thing (e. g. building its road to Austin), the Legislature having no power under the Constitution (of 1869) to make any grant of land, could not confer upon it the right to earn lands by doing another—a different thing (e. g. building the road to San Antonio). (Pp. 354, 355.)

### 3. Intent of Special Act of July 27, 1870.

It does not appear from the language of the special act of July 27, 1870, for the benefit of the Galveston, Harrisburg & San Antonio Railway Company, that it was to transfer to it the land grant it had upon building to Austin, to the line to be completed to San Antonio, as the company retained the right to build to Austin. The said railway company did not, by virtue of said act, acquire the right to earn lands by the construction of its line to San Antonio. (P. 355.)

### 4. Equities.

The laws as to land grants to railroads prior to 1869 were repealed by the constitution of that year, and the Galveston, Harrisburg & San Antonio Railway Company cannot maintain, in the action by the State for the recovery of lands illegally granted for its road between the Colorado and Guadalupe Rivers from 1870 to 1876, the defense that the State is in no position to ask the relief, for the reason that the railway company has earned the certificates for 163 miles west of San Antonio, for which no lands had been obtained. (P. 355.)

### 5. Same.

The claim is analogous to asserting that the claimant of land surveyed under a void certificate thereby had obtained some right to the land which would become valid from his ownership of valid certificates. (P. 356.)

QUESTIONS CERTIFIED by Court of Civil Appeals for Third District, in an appeal from Travis County.

*J. B. Blair, T. D. Cobbs* and *Baker, Botts, Baker & Lovett,* for appellant.—Appellant was chartered by special act of February 11, 1850, and the eastern terminus of its road was on Buffalo Bayou (Laws 1849-'50, page 194). It was therefore entitled to the land grant provided by the

general law of January 30, 1854, after the removal of its disability with respect to gauge of its road, which was accomplished by the special act of February 4, 1854, amending its charter, subject to the restrictions with respect to its route imposed by the second special act of the same date. The general law of January 30, 1854, was in force when the act of November 13, 1866, extending it for ten years, was passed, and the latter act had the effect, as it purported, to continue in force for ten years the act of January 30, 1854. The court also concedes that section 6, article 10 of the Constitution of 1869 was intended to have purely a prospective effect, and did not operate to repeal either the law of 1854 or that of 1866 as to railroad companies then in existence. We need not, therefore, discuss these propositions, but shall assume them as premises for the propositions which we shall now urge.

Appellant has all the rights and privileges conferred by charter or general law upon the Buffalo Bayou, Brazos & Colorado Railway Company. Appellant is but the Buffalo Bayou, Brazos & Colorado Railway Company under another name and with the additional rights and powers granted by the special act of July 27, 1870 and belonging to different persons. Section 5 of the law of December 19, 1857, is expressly referred to in the preamble to the special act of July 27, 1870, changing the name of appellant. This action was incorporated into the Revised Statutes of 1879 as art. 4260, and we apprehend that most of the railroads of the State, having at one time or another passed through foreclosure and sale, are maintaining their existing organizations by virtue of it. When, therefore, the railroad and the property rights and franchises of the Buffalo Bayou, Brazos & Colorado Railway Company were sold, as stated in the preamble to the act of July 27, 1870, the corporation itself passed to the purchasers at such sale. The corporation had the right to mortgage its corporate franchises, and all its charter rights and privileges were subject to sale for its debts. The purchasers acquired all these by virtue of the sale, and succeeded to all the rights of the original corporators by force of the act of 1857, above recited. It was the same corporation. No further legislation was necessary to authorize the purchasers to exercise all the functions and enjoy all the rights and privileges of the old corporation. (H. & T. C. R. Co. v. Shirley, 54 Texas, 125, 138.) If a new corporation were to be brought into existence legislation would be necessary; for corporations can be created in this State in no other way. Under the operation of the statute above recited the existence of the corporation is not in any manner affected by the sale of its corporate rights, franchises and other property. Its relations to the State and to the public remain precisely the same. Its ownership and control is merely transferred from its stockholders to the purchasers at the sale, who take the place of the old stockholders. Whenever stockholders of a corporation do not pay its debts, its creditors, under executions or mortgages, sell it out, whereby the ownership of the corporation is transferred from one set of persons to another. In other words, it is property which may be levied upon and sold under

legal process just as other property, and the purchaser takes the title free from claims against the former owner unsecured by lien just as he takes the title to other property sold in the same manner. The identity of the property is no more destroyed in one case than the other. The "road-bed, track, franchise and charter powers and privileges" constitute an "entire thing" under the statute, and as such all is passed to the purchaser. (Railway v. Newell, 73 Texas, 335, 338.)

Even if there had not been in force any such law as that of section 5 of the act of December 19, 1857, above recited, the special act of July 27, 1870, clearly recognized the purchasers at the sale referred to as owners of the corporation and appellant as its successor. That such was its meaning is apparent from many features of the act. It is indicated by the title: "An act supplementary to an act to incorporate the Buffalo Bayou, Brazos & Colorado Railway Company," etc. It assumes that the power and franchise to construct and operate a line of railway already exists, and that the purchaser has the charter and all the franchises of the new company. It refers to appellant as "the company heretofore known as the Buffalo Bayou, Brazos & Colorado Railway Company," etc., and authorizes it to "alter its seal," etc.

It is clear, therefore, that appellant is in effect the same corporation as once existed under the name of the Buffalo Bayou, Brazos & Colorado Railway Company, subject to the changes that may have been wrought by subsequent legislation; and that as such it is entitled to the rights of that company under its charter and the acts relating to it, and under the general laws of the State, to the same extent as if there had never been any sale of the rights and franchises of that company, or any changes in its ownership.

No new corporation was created by the special act of July 27, 1870. That act merely changed the name of appellant, removed the restriction respecting its route via Austin, imposed by the special act of February 4, 1854, and made other regulations in reference to the corporation which need not be further considered here. It remained the same corporation, with all the rights conferred by its original charter and amendments of the same; and there was no attempt by said act to deprive it of the land grant to which it was entitled under the act of January 30, 1854. It was one of the railroad companies for whose benefit that law was passed. This court has held in the Quinlan case, just decided, that that law was for the benefit of, and applied only to, railroad companies theretofore chartered; and appellant was, as we have seen, chartered by special act of February 11, 1850. That grant was a right and a franchise conferred upon appellant. Other corporations, thereafter created, might construct more roads than appellant, from the Gulf coast in a westerly direction, and accomplish, even more perfectly, the objects sought by the passage of that act, and yet would not be entitled to any of the lands thereby granted, because not contemplated by and coming within the act. It was a right or franchise peculiar to appellant and other companies theretofore chartered for the construction

of roads westward from Buffalo Bayou or the Gulf coast. This right, to sixteen sections of land for each mile of road constructed by it, existing by reason of the fact that it had been chartered prior to January 30, 1854, was as much a franchise of the Buffalo Bayou, Brazos & Colorado Railway Company, which passed to the purchasers at the sales in question, as was the right to construct and operate its railroad. It was a right which the legislature had the power to renew and extend beyond the time originally fixed for its expiration. It was a right which the Legislature could confer, as it did by special acts in many instances, upon other corporations not coming within its terms originally, and under such restrictions as the Legislature saw proper to impose.

Did the change in the route carry with it the land grant?

Appellant, then, was entitled to the benefits conferred by the act of January 30, 1854. Its rights, under that act, were preserved until two years after the close of the war by the act of 1862, and were extended for ten years by the act of November 13, 1866. The rights of appellant, under its original and amended charters, to the land grant provided by the act of 1854, were as valid and possessed as much vital force on the date when the Constitution of 1869 was adopted as at any other time. It had undertaken the construction of its road, expended its means, and placed itself in a position to enjoy the benefits of that legislation. The court readily admits that the legislature had the right and power to change the route of appellant's road. It was created by the Legislature; its route was defined, and all its powers were derived from legislative grant. The requirement, that it should construct its road via Austin, was imposed by special act of the Legislature. It was a restriction imposed by the Legislature, and it necessarily follows that it could be removed by the Legislature.

The court further concedes, in effect, that in the absence of constitutional prohibition, and with the laws granting lands in force, legislative authority to the company to change the line to be constructed would carry with it the right to earn the lands for the new line to be constructed.

In other words, the effect of the court's holding is: that if the act of July 27, 1870, had been passed twelve months earlier, or at any time before the adoption of the Constitution of 1869, the change of route authorized by the act would have carried with it the land grant in question, but that the Constitution of 1869 having been adopted, the change of route operated, in effect, to forfeit the land grant. And it is thus held, in the face of the concessions made in the opinion, that the land grant had been preserved for ten years by the act of 1866, and that section 6, article 10 of the Constitution of 1869 was intended to have only a prospective effect, and did not repeal either the act of 1854 or that of 1866. If it be true, as is obvious from the language of the section, that the provision of the Constitution just referred to was intended to have a purely prospective effect, and did not repeal the laws granting lands to appellant, how can it possibly be a denial of the right

of the legislature to remove the restriction with respect to the route of appellant's road and operate to forfeit the land grant which such change of route would have otherwise carried with it? How could the adoption of a constitution, operating prospectively, and not repealing the existing law, take away a right existing under such law, or give to an act of the legislature a different meaning and effect from that which the identical act would have had but for the adoption of the Constitution? Such conclusion would seem to be logically impossible.

The act authorizing appellant to change its route was just as valid as if it had been passed before the Constitution was adopted. This is not disputed. The Legislature had just as much right to vary the route of appellant's road on July 27, 1870, as on the same date in 1869; yet the court holds, in effect, that the same act expressed in the same language has one meaning on one date and a different meaning on another date, though valid on both. Appellant clearly had the right, under the legislation of 1854, and the subsequent acts preserving and continuing the same, to sixteen sections of land for each mile of road it should construct under its charter. The only theory upon which it is claimed in the opinion that it is not entitled to the land in controversy, is because the special act of February 4, 1854, required appellant's road to be constructed via Austin. That was a restriction placed upon the right by the Legislature, and which the Legislature could remove at will. Such restriction was removed by the act of July 27, 1870. The original right to the land was not affected by either act. The route was changed as the Legislature had a right to change it, and the right existing by virtue of the original grant, the change, as the court concedes, carries the right to the grant with it, and if, as the court very properly holds, section 6, article 10 of the Constitution of 1869 had only a prospective effect, and did not repeal existing rights, we submit that it inevitably follows that it could not give to the act changing the route the effect to deprive appellant of its land grant when no such effect would have followed but for the adoption of the constitutional provision in question. It is worse than idle to say that the Constitution of 1869 was intended only to operate prospectively and not to repeal an existing right, when, in the same breath, the court holds that its adoption deprives appellant of a land grant to which it was otherwise entitled. Would the change of route, in the absence of constitutional prohibition, have carried with it the right to the land grant? The court holds that it would. Then why did not that result follow in this instance? The court says it would, but for the adoption of the Constitution of 1869. But that is impossible, for the court says that Constitution, with respect to the section in question, was intended to have purely a prospective effect, and did not repeal any existing right of appellant.

We insist, with the utmost respect, that the conclusion of the court is illogical and inconsistent with the guides established by the court itself, and deprives appellant of, and forfeits its right to, vast property to which it is clearly entitled under laws which the court concedes to

be valid and effectual.    The right to retain its land grant with a change in the route of its road was an important element in the rights of appellant existing under its charter and the general laws of 1854, 1862 and 1866.    As a necessary result of the court's holding, this element—this all important element—in the rights of appellant existing under such laws, and which the court admits, was taken away by section 6, article 10 of the Constitution of 1869, although intended to operate prospectively and to respect and preserve such rights.    Instead of giving to that constitutional provision such broad and sweeping effect—extending, we submit, beyond the limits justified by any rule of construction—the court ought to look upon it with disfavor and restrict it within the narrowest bounds that its language will justify.    It did not voice the sentiment of the people of this State.    It was at variance with the public policy of the State and with the uniform course of legislation for many years. It was framed by a convention which did not represent the people of this State, and was practically dictated by the power of one man whose rule has not entirely come to be regarded as a particularly bright page in the State's history.    The very first Legislature which convened after it was adopted, and in but little over a year, proposed an amendment abolishing it and returning to the policy which had become characteristic, and which resulted in so much benefit to the State.    This amendment was adopted by the people, and this provision, which is now given an effect far beyond its conceded meaning, was repudiated and condemned by the people of the State at the first opportunity they had to express their opinion at the ballot box, for they were practically disfranchised when it was adopted.    It is entitled to none of the weight which may justly be accorded to a constitutional provision evidencing a wise public policy, and therefore entitled to be regarded as the voice of the people. It does not, in terms, purport to repeal or impair any of appellant's rights, and we submit that it should not be given a meaning wholly unwarranted by its language, at variance with the settled policy of the State, condemned and discredited by the people of the State, and especially when such meaning deprives appellant of lands which it had earned, and which were granted it in accordance with what had then been, and was thereafter for many years, one of the most conspicuous policies, as well as one of the most wise, which distinguished the State through what has been thus far the most prosperous periods of her existence.

In Railway v. Gross, 47 Texas, 428, this court upheld legislation passed in contemplation of an amendment of the Constitution, and contingent upon such constitutional change, with respect to our public lands.    The same legislature then passed the special act of July 27, 1870, relating to appellant, and within less than a year thereafter, i. e., on May 17, 1871, proposed the amendment to the Constitution, which was subsequently adopted, abolishing section 6, article 10 of the Constitution of 1869, as originally contained in that instrument (Gen. Laws 1871, p. 160).    The special act of July 27, 1870, relating to appellant and authorizing change in the route of its road, instead of being at variance with the policy of

the State, was entirely in harmony therewith; and instead of holding
that such change of route forfeited appellant's right, because of the
temporary existence of section 6, article 10 of the Constitution, we sub-
mit that the court ought to hold that there was never any break in ap-
pellant's right to the land grant in question, but that such rights, exist-
ing under its charter and the legislation of 1854, preserved by that of
1862 and 1866, accorded throughout with the settled policy and uniform
current of legislation and the sentiment of the people of the State.   We
earnestly submit that appellant's rights ought not to be forfeited by the
perversion of the settled policy of the State accomplished temporarily by
section 6, article 10, as originally incorporated in the Constitution of
1869.   The language of that provision does not require it, and regard for
the intention of every Legislature chosen by the people in those years
and the good faith in which the lands were earned by appellant, and
with which the certificates were granted by the State, forbid it.   *   *   *

*M. M. Crane,* Attorney General, for appellee.—It is conceded that the
Buffalo Bayou, Brazos & Colorado Railway Company was chartered in
1850.   This charter and its several amendments marked out the line
upon which the road should be constructed, and it specifically limited
the line to one route.   It was authorized to build on no other.   It is
not pretended by appellant's counsel that the road was constructed in
accordance with the terms of that charter.

It being admitted that this land could not have been obtained under
the terms of that charter, the questions as to whether that charter con-
stituted a contract between the State and the railroad company may be
dismissed.   The land that appellant claims to have earned is claimed
under the general Act of 1854, giving it 16 sections of land to the mile.
That general act was no part of its charter.   Its charter originally gave
it 8 sections of land per mile.   By the Special Act, approved February 4,
1854, it was stated that this road "shall be entitled to all of the rights,
privileges and benefits accruing from any general law or laws that have
or may hereafter be passed by this State to encourage the construction
of railroads, in the same manner and to the same extent as if the guage
of said road was the same as now fixed or which may be hereafter fixed
upon by the State."

What was the effect of this Special Act?   It was to permit the railroad
company named therein to enjoy the benefits of the general laws in so
far as land donations were concerned.   The general law was no part of
its charter.   The Legislature retained the inherent right to modify or
change the general law.   It cannot be fairly stated that the Legislature,
in permitting this railroad company to elect between the terms of its
charter or contract with the State, and the terms offered to other roads,
of different gauges, by general statute made or intended to make an irre-
vocable contract with this railroad company.   This general law, whose
terms were not complied with, could not constitute a contract between
any railroad company and the State.   It was an offer, nothing more.

Until the offer was accepted, it could not form a contract.  Its acceptance could not be evidenced by any act short of the construction of the railroad in substantial compliance with the terms of the act.

This law stood in the same attitude as the homestead law.  The State at various times gave to actual settlers within her limits large bodies of lands as homesteads.  The amount of the homestead grants was gradually reduced until the limit of 160 acres to the head of a family was reached.  It was never insisted that the offer of a homestead made in the Constitution and in the statutes of the State constituted a contract beween the State and any citizen of Texas who did not accept the offer made and undertake to select and make for himself a home.

So it was with the railroad company.  The general act offered it and all other railroad companies sixteen sections of land to the mile for all the road thereafter built; but until the roads were built, there was no contract.  It certainly takes two parties to make a contract—the one must offer and the other accept.  Until the offer is accepted it may be withdrawn.

It follows, therefore, that in so far as this legislative offer, made under the general law, was not accepted on the terms therein stated, and on the limitations imposed by its charter, there was no contract between that company and the State.

It is well settled that the general law is not a contract until the offer made therein has been accepted and the terms and conditions which it imposes have been complied with.   Cooley Constitutional Limitations, 347; Christ Church v. Philadelphia, 24 How., 300;  East Saginaw Salt Co. v. East Saginaw, 19 Mich., 259;  2 Am. Rep., 82;  12 Wall, 373.

The railroad company, in so far as this question is concerned, was left substantially in this condition.  Its charter being amended by the act of 1854, left it restricted to a certain route which had been pointed out.  For building a line of railroad on that route its charter permitted it to receive such grants of land as the general law then in existence, or that might thereafter be enacted, should give it.

As before stated, accepting the provisions of the general law, it must have waived the grant of its charter; it could not claim both.  It could not claim the eight sections per mile guaranteed in its charter and the sixteen sections which the general law authorized it to receive.  Accepting under the general law, it took it with all the contingencies incident to general statutes.  Until it built the road pointed out in its charter, which it was authorized to build, there was no contract with the State.  This unaccepted offer might be withdrawn by the Legislature or by the people, whose agent the Legislature was.

That the Legislature could have repealed this act before its offer was accepted is clear.  Southerland on Statutory Construction, section 136, and authorities there cited.

What the Legislature might do as agent of the people, surely the people might do for themselves.  That a statute might be repealed by

changing the Constitution is not an open question. Sedgwick on Statutory and Constitutional Construction, middle section of page 107.

This court said in the case of the G., H. & S. A. Ry. Co. v. State (81 Texas, 597): "At the date of that act (meaning the act of 1870) the power to grant lands in aid of the construction of railways had been taken from the Legislature by the Constitution of 1869, and the laws making such grants impliedly repealed except as to existing rights."

In Bacon & Bates v. Russell, 57 Texas, 416, this court said: This section of the Constitution (meaning the one under discussion) evidently prohibited not only the direct grant of land, but it prohibited every step which could ultimate in a grant of land to other than an actual settler. . . . It is true that the act of 1837 was never in express terms repealed, but it is believed that the provision of the Constitution referred to had that effect." Thus it will be seen that this court had twice held that the Constitution of 1869 did repeal all laws which had for their purpose the grant of land to other than actual settlers, whether passed in 1837 or 1854. Bacon & Bates v. Russell, 57 Texas, 416; Railway v. State, 81 Texas, 597.

These decisions are necessarily correct. As has been well said, "In such cases a repeal is inferred from necessity if there be such conflict that the old and the new statutes can not stand together." Southerland on Statutory Constructions, sec. 137. Or, as again stated by the same author, "In the nature of things it (meaning repeals) would be so, not only on the theory of intention, but because contradictions can not stand together." Southerland, page 180, and authorities there cited

It has even been held that the adoption of a treaty with the stipulations of which the provisions of a State law are inconsistent, is equivalent to the repeal of the State law. Deen ex-demise Fisher v. Harndon, 1 Paine, 55. It can make no difference whether the statutes conflict with a treaty subsequently made, with a statute subsequently passed, or with a constitution afterwards adopted, the statute first passed must yield.

The new Constitution must have meant what it said, that is, that no lands should be thereafter granted to railroad companies by the Legislature. It likewise meant that all unaccepted offers made by the Legislature then in existence (and there must have been one in existence whether in session or not) were thereby withdrawn, and the power of the Legislature to extend such offers revoked. To say less than that would leave a statute previously passed, which was repugnant to the new Constitution, in force until such time as the Legislature might repeal it. That would involve an absurdity. It would make the Legislature superior to constitutional conventions. Constitutional prohibitions need no legislation. They are self-executing. The provisions against usury so often construed by this court illustrate that point.

If the foregoing contention can be maintained, it must follow:

1. That by the terms of the charter the Buffalo Bayou, Brazos & Colorado Railway Company was limited by its charter to building a line

to Austin, and thence northward, connecting with a line to the Pacific coast, between the 96th and 98th parallels of longitude.

2.   That after the amendment of its charter, in 1854, it was limited to the general laws then in existence and that might thereafter be passed (which was an implied recognition of the right of the Legislature to change the general laws) in so far as it might claim donations of land.

3.   That the road for which land is claimed, not having been built until the general statute was repealed by the Constitution of 1869, the railroad company was not thereby entitled to any land, because it did not construct the road in controversy before the repeal of the general act, which authorized the grant of land.

It also follows that inasmuch as the right to grant land was taken from the Legislature, whether claimed under old or new statutes, by the Constitution, it is immaterial to inquire whether appellant is but a continuation of the old company under a new name, or whether it is a new corporation, neither would have the right to land grants.

Has the appellant all the rights and privileges conferred by charter or general law upon the Buffalo Bayou, Brazos & Colorado Railway Company?   Appellant argues that it is but the Buffalo Bayou, Brazos & Colorado Railway Company, under another name, and with the additional rights and powers granted by the special act of July 27, 1870, and belonging to different persons.   The special act, however, does not support the argument.   *   *   *

In the face of this act it is unreasonable for the appellant to assert that it is the old company under a new name, when the act from the preamble to its conclusion repeatedly reiterates that it is a new company. Whenever the old company is referred to, it is either as the "old company" or the "sold out" company.   The act of 1870 created a new company.   It conferred upon it powers which the old did not possess. It would be a palpable perversion of justice to hold otherwise.   It was a new corporation.   That much should be admitted.

Suppose it be conceded that it had all the rights that the old company had,—what rights did the old company have?   It had the right to get sixteen sections of land to the mile for building the road to Austin, but not for building the road from the Colorado River to San Antonio. In other words, the old company had no right under its charter to earn the lands involved in this suit.   Not having such right, it could not convey it by voluntary or involuntary sale.   In other words, the old company or the sold out company could not convey to the new company any right which it had not.

The act of 1870, authorizing appellant to build a new line of railroad, was a grant direct from the State to the new company, and was not acquired by the new company from the old.

This grant of power obtained from the Legislature must be measured by the same rule as if obtained from a private individual.   The Legislature could not give to the new company a power which it did not possess.   The Constitution of 1869 had said to it that it should not grant any

more lands to railways. It must be apparent, therefore, that to the new company the Legislature in 1870 could not grant any lands for building the road in question. It could not exceed the constitutional limitation of its powers. * * *

GAINES, Chief Justice.—The following questions have been certified for our determination:

"The State of Texas instituted suit against appellant to cancel certain land certificates and patents issued by the State to appellant, for land, amounting to 879,078 1-20 acres. It was alleged and proved that the certificates and patents were issued to the Galveston, Harrisburg & San Antonio Railway Company, for a portion of its railroad constructed, between the Colorado River and Guadalupe River, between the time of the adoption of the Constitution of 1869 and the passage of the act of August 16, 1876 (arts. 4267 to 4277 Rev. Stats.) On July 27, 1870, by special act of the Legislature, appellant was chartered and recognized as the successor of the Buffalo Bayou, Brazos & Colorado Railway Company. After the passage of the act of August 16, 1876, and before its repeal in 1882, appellant constructed about 163 miles of railroad from San Antonio westward towards El Paso, for which the State refused to issue land certificates, the Governor refusing the application for inspection on May 22, 1882, on the ground that the law granting certificates has been repealed.

"Question 1. Did section 6, article 10 of the Constitution of 1869 repeal all laws giving railroad companies the right to earn lands from the State by the construction of railroads, and if so would this repeal apply as well to the right to earn lands given through charters as through general laws?

"Question 2. If the above be answered in the negative, did appellant succeed to the rights of the Buffalo Bayou, Brazos & Colorado Railway Company by virtue of the special act of 1870, said Buffalo Bayou, Brazos & Colorado Railway Company being restricted by special act of February 11, 1854, to run its line to Austin?

"Question 3. If the laws as to land grants to railroads passed prior to 1869 were repealed by the Constitution of that year, can appellant interpose and maintain in this suit the equitable defense that if the certificates issued for that portion of the road between the Colorado & Guadalupe rivers from 1870 to 1876 were illegally obtained, that the State is in no position to ask the relief sought by reason of the fact that appellant has earned the certificates for said 163 miles of road?

"Question 4. If the last question be affirmatively answered, would the fact that at the time the land for the 163 miles west of San Antonio was earned by appellant, the public lands were exhausted, affect the equities of the case?"

1. Our opinion upon the second question certified renders, we think, a decision of the first unnecessary. We therefore pass to a discussion of the second.

2. The Buffalo Bayou, Brazos & Colorado Railroad Company was incorporated by a special act of the Legislature, to which there was several amendments. Its name was changed to that of the Galveston, Harrisburg & San Antonio Railway Company also by special act. The statement accompanying the question does not expressly advise us whether these acts were pleaded and proved upon the trial or not. However, the briefs of the parties which were filed in the Court of Civil Appeals, and which are sent up with the certificate, indicate that they were. Since it is impossible for us properly to decide the questions submitted without having before us the legislation upon which the company bases its claims to the lands in controversy, we conclude that the special acts of the Legislature affecting that claim were properly brought to the knowledge of the trial court and that the questions have been certified upon that assumption. We shall therefore discuss the points presented, assuming that we are to look to all the legislation upon which the company's claim depends.

The act incorporating the Buffalo Bayou, Brazos & Colorado Railroad Company was approved February 11, 1850. By that act the company was authorized to construct and maintain a railroad, "commencing at any suitable point on Buffalo Bayou, between Lynchburgh and Houston in the County of Harris, and thence running by such course and to such point at or near the Brazos River, between the towns of Richmond and Washington inclusive, as said company shall deem most suitable, with the privilege of making, owning and maintaining such branches of said railway as they may deem expedient." (Laws 1849-50, p. 194.) No privilege of acquiring lands was granted by this act, but another special law was passed by the Fourth Legislature and was approved January 27, 1853, which authorized the Commissioner of the General Land Office to issue to the company certificates to the amount of eight sections of land for each mile of road that should be completed and put in good running order,—under certain restrictions not necessary to mention. (Special Laws 1853, p. 3.) On the 30th day of January, 1854, a general statute was approved by the Governor, which granted to all railroad companies, which had theretofore constructed or which should thereafter construct, twenty-five miles of railroad, certificates to the amount of sixteen sections of land for each mile of road. (Laws 1853-4, p. 11.) This act also contained conditions and restrictions which we need not detail in this connection. The same Legislture passed two special acts, one amendatory of the charter of the Buffalo Bayou, Brazos & Colorado Railroad Company, and the other supplemental thereto, the first of which provided: "That the 'Buffalo Bayou, Brazos & Colorado Railroad Company' shall be entitled to all the rights, privileges and benefits accruing from any general law or laws that have or may hereafter be passed by this State to encourage the constructing of railroads, in the same manner and to the same extent as if the guage of said road was the same now fixed or which may be hereafter fixed upon by this State." By the second it was provided: "That if the Buffalo Bayou, Brazos & Colorado Rail-

road Company shall avail themselves of the act to which this is a supplement, or accept any donation of land from the State, they shall not be entitled to receive any such donation from the State under the provisions of this law, or any law that has heretofore been passed for their benefit, for any portion of their road which shall not be completed and ready for use within ten years from and after the passage of this act. Provided, that said company shall restrict themselves to the following route, viz., to an extension of their existing road to Austin, in the County of Travis, crossing the Brazos River at any point between the town of Richmond, in Fort Bend County, and Hidalgo Falls, in Washington County, and with the right of extending their road from Austin to connect with any road running north of Austin towards the Pacific Ocean. Provided, such connections be made between the ninety-sixth and ninety-eighth parallels of longitude; and provided further, that said company shall have no right to build branches from their main road."

Both these acts were approved February 4, 1854. Whether or not the company ever accepted the benefits of these acts, the meagre statement of the Court of Civil Appeals does not advise us; but since the act of July 27, 1870, which changed the name of the company to its present name, under certain conditions authorizes an issue of certificates to the amount of sixteen sections per mile for such portions of the road as had been constructed before the war, but not within the time provided by the act of January 30, 1854, we infer that it did so accept.

During the period of the Civil War two laws were passed which had the effect to relieve the existing railroad companies from the limitations as to time embraced in the act of 1854, until two years after the close of the war; and on the 13th of November, 1866, an act was approved, which contained the following section: "Be it enacted by the Legislature of the State of Texas, that the grant of sixteen sections of land to the mile, to railroad companies heretofore or hereafter constructing railroads in Texas, shall be extended, under the same restrictions and limitations heretofore provided by law, for ten years after the passage of this act."

The special act of July 27, 1870, recognized the present company as the purchaser of the franchises, rights and property of the original company, which had been "sold out," and as its successor, and changed the name to that of the Galveston, Harrisburgh & San Antonio Railway Company, and amended its charter in important particulars. We quote so much of that law as is deemed necessary for the purposes of this opinion: "Whereas, on the seventh July, 1868, 'the road-bed, track, franchise and chartered rights and privileges' of the Buffalo Bayou, Brazos & Colorado Railway Company were sold on executions issued on judgments against said company; and on the 24th January, 1870, the railroad of said company from Harrisburg to Alleyton, and its franchise, rights and other property appertaining thereto, were sold under the provisions of a mortgage or deed of trust made by said company on the first November, 1860, all of which appears of record; and

"Whereas, the Act of December 19, 1857, 'supplementary to and amendatory of an act to regulate railroad companies', provides that the purchasers at such sales and their associates 'shall be entitled to have and exercise all the powers, privileges, and franchises granted to' the company sold out 'by its charter, or by virtue of the general laws of this State,' and 'shall be deemed and taken to be the true owners of said charter and corporators under the same, and vested with all the powers, rights, privileges and benefits thereof;' and

"Whereas, the purchasers at said sales, and their associates, have formed a new company under said old name, and have expended large sums of money in the reconstruction of said railroad, in the purchase and completion of the Columbus Tap Railroad, and the bridge of the Brazos Iron Bridge Company over the Brazos River at Richmond, and Whereas, said new company desires to be distinguished by name from said 'sold out' company, to consolidate its property, and to extend said line of railroad; therefore,

"Section 1.   Be it enacted by the Legislature of the State of Texas, that the new company heretofore known as the Buffalo Bayou, Brazos & Colorado Railway Company, referred to in the preamble of this act, shall be hereafter known by the corporate name of 'The Galveston, Harrisburg & San Antonio Railway Company,' and may alter its seal to conform to its name;  provided, that said new company shall be liable to the State of Texas for the debt of said 'sold out' company, for loans made to the latter company from the special school fund, in the same manner and to the same extent as said 'sold out' company was liable; and that said change of name shall in no respect impair or affect said liability, or the existing lien or mortgage of the State upon the railroad of said company as security for said loans."

But the Constitution which was in force at the time the last named act was passed contained this provision: "The Legislature shall not hereafter grant lands to any person or persons, nor shall any certificates for land be sold at the Land Office, except to actual settlers upon the same, and in lots not exceeding one hundred and sixty acres." (Cons. 1869, art. 10, sec. 6.)

In so far as the determintion of the question under consideration is concerned, we think it may be conceded for the purposes of the argument, that the company acquired a right to sixteen sections of land per mile of constructed railroad, under the general law of 1854, and the special acts above recited amendatory of its charter; and that this right was preserved by the general law of 1866.  It may also be conceded for the same purpose, that section 6 of article 10 of the Constitution of 1869 was intended to have purely a prospective effect, and did not operate to repeal either the law of 1854 or that of 1866, as to railroad companies then in existence.  For if it should be held, that the privileges extended by the previous laws to existing companies was not affected by the section, the question arises, whether after that Constitution took effect an act of the Legislature which authorized the company to change its for-

mer route and to constitute a different line of road would carry with it the right to acquire land by the construction of. the new line? It must be borne in mind, that when the Constitution of 1869 was adopted no general law was in force for the incorporation of railroad companies. The charters of all the other existing companies had been granted by special acts of the Legislature, all of which defined with some degree of certainty the line of the road to be constructed. We construe the general law of January 30, 1854, as applying only to companies then chartered. (See Quinlan v. H. & T. C. Ry. Co., this day decided.) It is clear that it was intended to grant lands to the companies for the construction of railroads which their charters authorized them to build. It may be conceded, that so long as the general law which granted the privileges of acquiring lands remained in force and so long as no constitutional inhibition stood in the way, legislative authority to a company to change the line to be constructed should be construed to carry with it the privilege of earning lands for the construction of the new line. At all events, it is clear, we think, that the act of February 4, 1854, supplemental to the act of the same date which extended the privileges of the general law of January 30, 1854, to the company, restricted those privileges to the line to Austin and to the extension of that line. The proviso, "that said company shall restrict themselves to the following route, viz.: to an extension of their existing road to Austin," etc., admits of no other construction. The purpose and effect of the first section of the act of November 13, 1866, was merely to give to the companies to which it applied, ten years from the date of the act, within which to comply with the terms of their charters and the general laws with respect to land grants. Let us admit then for the purposes of the argument, that in 1870, when the name of the company was changed, and when it was granted authority to alter the line to be constructed, that it had the right to acquire lands by the construction of its line as fixed by the supplemental act of February 4, 1854, we are still confronted with the question: Did the Legislature have the power, had it so intended, so to authorize a change of its line and at the same time to carry with the change of line the privilege of earning lands for the construction of a different road? Section 6 of article 10 of the Constitution then in force prohibited the Legislature from granting lands thereafter for the construction of a railroad. That it could authorize a change of route there can be no question, but there is a grave question whether or not it could, under the Constitution then existing, transfer a privilege of acquiring lands by the construction of a well defined line of railroad from the route so defined to another not contained in the previous grant. The company, before the passage of the act of 1870, had no right to acquire lands by the building of a railroad to San Antonio; to complete that right, a new grant was requisite; but at that time the Legislature was prohibited in the broadest terms from making any grant whatever. It matters not that the transaction may be looked upon as being somewhat in the nature of an exchange, and that the building

of the new line may have involved a grant of no more, or even of less land, than may have been acquired by the construction of the old line. It involved a grant of land as to the new line and that the Legislature had no right to make.  Let us state the proposition in another form. If it were the right of the company, under the existing laws, to acquire lands by doing a specific thing, the Legislature having no power under the Constitution to make any grant of lands, could not confer upon it the right to earn lands by doing another—a different thing.

So far we have discussed the question, as if in passing the act of 1870 the Legislature had intended to transfer the right of the company as to the lands to be acquired, from the old to the new line.  But we find nothing in the act which manifests such an intention.  On the contrary, the 12th section of the act as above quoted indicates, that it was not the purpose in any manner to extend the existing rights of the company with reference to the acquisition of lands from the State.

It is to be noted that the 3d section of the act of 1870 not only authorized the company to change its route so as to run to San Antonio instead of Austin, but in addition thereto reserved to it the right to build upon the route formerly designated by the sold out company.  It is evident, therefore, that to concede to the company the right to earn lands by the construction of the new line involves a new and additional grant— a grant which the Legislature, under the Constitution of 1869, could have made neither expressly nor by implication.

This question was before this court at a former term in a suit between the same parties and the point was there resolved as we resolve it now. (Railway v. State, 81 Texas, 572.)  But it is urgently insisted, that the question was not involved in that case.  Without conceding the correctness of this contention, in view of the magnitude of the interests involved in the present case, we have gone over the question anew, and without reposing upon the former decision, have arrived at the same result.  We are, therefore, of the opinion that the Galveston, Harrisburg & San Antonio Railway Company did not by virtue of the act of July 27, 1870, acquire the right to earn lands by the construction of its line to San Antonio.

3.  Referring to the third question certified by the Court of Civil Appeals, we are of the opinion that it is no defense to an action of the State for the recovery of the lands involved in this suit, that the company may have been entitled to certificates for the 163 miles of additional road, constructed under the law of 1876.  It acquired no title either legal or equitable to the lands in controversy by causing them to be surveyed and patented under the certificates granted for the San Antonio extension.  To make its right to lands earned by the additional construction effectual for any purpose, it must have procured its certificates and located them upon some portion of the public domain not reserved from the location of such certificates.  Our complicated and ever varying laws in regard to the appropriation of the public domain have probably given rise to more questions affecting the location

of lands than have ever arisen in any other jurisdiction; and yet we know of no case in this court in which it has ever been ruled that the claimant of land against the State under a location made by virtue of a void certificate has any equity in the premises by reason of being the possessor of another valid certificate.

4. The third question not having been answered in the affirmative, the fourth does not arise.